MARKMAN, J.
We granted leave to appeal to consider this funding dispute between the 46th Circuit Trial Court (hereafter the Trial Court) and two of its three county funding units. This case involves a conflict between the legislative branch’s exercise of the “legislative power” to appropriate and to tax, and the judicial branch’s inherent power to compel sufficient appropriations to allow the judiciary to carry out its essential judicial functions. Specifically, the Trial Court seeks to compel the defendant counties to appropriate funding for the enhanced pension and retiree health care plans it deems necessary to recruit and retain adequate staff to allow it to carry out its essential judicial functions. The circuit judge found in favor of the Trial Court, holding that the benefits were “reasonable and necessary” to the court’s ability to perform its constitutional responsibilities and that the counties created for them *135 selves a contractual obligation to appropriate funds for the enhanced pension and retiree health care plans. The Court of Appeals affirmed. Because we conclude that such benefits were not “reasonable and necessary” to the “serviceability” of the court, and because we conclude that the defendant counties were not contractually obligated to appropriate funds for the enhanced benefits plan sought by the Trial Court, we reverse the judgment of the Court of Appeals and remand this case to the circuit judge for entry of a judgment in favor of defendants.
I. FACTS AND PROCEDURAL HISTORY
The Trial Court’s predecessor, the 46th Circuit Court, was the circuit court serving Otsego, Crawford, and Kalkaska counties. Pursuant to Administrative Order No. 1996-9, 451 Mich civ, the 46th Circuit Court, along with the district and probate courts within these counties,[1] became part of a demonstration project designed to evaluate the feasibility of consolidating various court functions into a single entity known as the 46th Circuit Trial Court.[2] The chief judge of the 46th *136 Circuit Court was appointed the Trial Court’s chief judge (hereafter Chief Judge), and Otsego County was designated as the Trial Court’s control unit.
In order to facilitate this consolidation, the Trial Court began a large-scale administrative reorganization for the purpose of standardizing wages, benefits, and personnel policies. During this reorganization in the summer of 2000, the Chief Judge requested that his employees switch to a less-favorable prescription drug and health insurance plan and that they relinquish longevity pay. In return for this concession, the Chief Judge agreed to seek an enhanced employee pension plan and a new retiree health care plan funded by the counties. The Chief Judge presented his enhanced benefits plan, first, to the Tri-County Committee, a nonbinding committee that consisted of individuals representing each county, and subsequently to each county’s board of commissioners. The boards of commissioners for Otsego and Kalkaska counties passed resolutions agreeing to implement the enhanced benefits plan. On August 29, 2000, the Crawford County Board of Commissioners passed the following resolution:
MOTION by Hanson, seconded by Beardslee, to authorize the County [to] pay 24% of $50,000 ($12,000) for the year 2000 and that payment will increase at 4% per year until 2017, and at that time will pay an estimated $94,649 and that the Blue Cross/Blue Shield medical supplement payment per individual would be capped at [sic] the year 2000 at $4,087.00 [and] would increase at 4% per year until 2017 for an employee to be eligible for $7,654.00 per year.
MOTION by Wieland, seconded by Hanson, to request the [Trial] Court not implement the MERS [Municipal *137 Employees’ Retirement System] B-4 upgrade at this time, but recognize the change in the 2001/2002 budget cycle.
That same afternoon, the Chief Judge informed the Chairwoman of the Crawford board that there had been an error in calculating the annual premium for the first year of the retiree health care plan and that the $4,087 figure was too low. The Chief Judge and the Chairwoman of the board subsequently agreed that the sum of $5,763 should be substituted as the correct first-year premium. However, the Crawford board never amended the resolution to reflect this new figure.
Following the vote in Crawford County, the Chief Judge prepared a contract memorializing the agreement. Although the contract was signed by representatives from Kalkaska and Otsego counties, Crawford County refused to sign the contract because of the board’s concern regarding the prospect of a sizeable unfunded liability.[3] Shortly thereafter, on December 4, 2000, the Chief Judge implemented both the enhanced benefits plan and the employee concessions by order. Initially, Crawford County alone refused to appropriate its share of the costs of the enhanced benefits plan for fiscal years 2001-2003. However, approximately one year after the implementation order was entered, the Kalkaska County Board of Commissioners rescinded its resolution approving the enhanced benefits plan primarily on the basis of the concerns raised by Crawford County.[4] Otsego County proceeded to fund the entire cost of the enhanced benefits plan without reimbursement from the other funding units.
*138 After unsuccessful attempts to settle the dispute, the Chief Judge communicated the notice required by Administrative Order No. 1998-5, § III(l), 459 Mich clxxvi, of the Trial Court’s intention to sue Crawford County. After the required 30-day waiting period expired, the Trial Court brought this action to compel funding, claiming both that Crawford County was contractually obligated to fund the enhanced benefits and that it had failed to provide sufficient funds to allow the court to operate. Specifically, the Trial Court argued that, absent the enhanced benefits, the morale of its employees would decline, leading to lower productivity and, as a result, the court would be unable to function. The Trial Court further argued that it could not generate sufficient savings in its budget to pay for the enhanced benefits and that any staff cuts would prevent the court from operating at a serviceable level. Crawford County denied the allegations and asserted in a counterclaim that the Trial Court had exceeded its authority when it implemented the enhanced pension and retiree health care plans and that the Trial Court had fraudulently misrepresented the costs of the latter. Kalkaska County moved to intervene on behalf of Crawford County. In a separate action, Crawford and Kalkaska counties sued Otsego County, claiming that Otsego County had improperly implemented the enhanced pension and retiree health care plans and had colluded with the Trial Court to withhold information about the cost of the pension increase. The cases were consolidated and the State Court Administrator assigned a circuit judge from outside the affected counties to preside over these cases.
The circuit judge eventually found that the Trial Court’s requested budget, specifically the requested appropriation for the enhanced benefits plan, was “reasonable and necessary” to the court’s ability to perform its essential functions. The requested appropriation *139 was “reasonable” because it was not “excessive” and was “comparable to what other courts spend on like activities.” The requested appropriation was also “necessary” because it had been “convincingly” proved that loss of the benefits plan would destroy employee morale to the point where the court could no longer function. The circuit judge also found that the August 29, 2000, resolution created an explicit contract with the Trial Court to implement the enhanced benefits plan. In a published opinion, 266 Mich App 150; 702 NW2d 588 (2005), the Court of Appeals affirmed.[5]
This Court granted the defendant counties’ application for leave to appeal, limited to the questions: (1) whether the appropriations sought for the enhanced benefits plan were “reasonable and necessary to achieve the court’s constitutional and statutory responsibilities”; (2) whether the defendant counties were contractually obligated to fund the enhanced benefits plan at the level requested by the Trial Court; and (3) whether there was evidence to support the conclusion that the level of funding offered by the counties was insufficient to allow the court to fulfill its essential functions. 474 Mich 986 (2005).[6]
*140 II. STANDARD OF REVIEW
Whether county funding of local court operations satisfies constitutional requirements presents a constitutional question that this Court reviews de novo. DeRose v DeRose, 469 Mich 320, 326; 666 NW2d 636 (2003). We review for clear error the factual findings underlying the circuit judge’s determination of whether the requested appropriation was “reasonable and necessary.” MCR 2.613(C).
Issues of contract interpretation Eire questions of law that we review de novo. Archambo v Lawyers Title Ins Corp, 466 Mich 402, 408; 646 NW2d 170 (2002). We review for clear error the findings of fact underlying the circuit judge’s determination whether a valid contract was formed. Alan Custom Homes, Inc v Krol, 256 Mich App 505, 512; 667 NW2d 379 (2003). A finding is “clearly erroneous” if, “the reviewing court, on the whole record, is left with the definite and firm conviction that a mistake has been made.” Bynum v EASB Group, Inc, 467 Mich 280; 285; 651 NW2d 383 (2002). The interpretation of a county resolution, as with the interpretation of a statute, is a question of law, which we review de novo. Eggleston v Bio-Medical Applications of Detroit, Inc, 468 Mich 29, 32; 658 NW2d 139 (2003).
III. ANALYSIS
A. "INHERENT POWER”
The judiciary’s “inherent power” to compel funding is an extraordinary power and is derived from the separation of governmental powers set forth principally in Const 1963, arts 4-6, relating to the authorities of the legislative, executive, and judicial branches of government, Eind Const 1963, art 3, § 2, which provides:
*141 The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.
The framers of Michigan’s Constitution understood well the importance of separating the powers of government. The doctrine of separation of powers rests on the notion that the accumulation of too much power in one governmental entity presents a threat to liberty. James Madison expressed this sentiment more than 200 years ago when he wrote, “the accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny.” The Federalist, No. 47. Thus, governmental power was separated— with the Legislature exercising the “legislative power,” Const 1963, art 4, § 1; the Governor exercising the “executive power,” Const 1963, art 5, § 1; and the judiciary exercising the “judicial power,” Const 1963, art 6, § 1.
The “legislative power” has been defined as the power “to regulate public concerns, and to make law for the benefit and welfare of the state.” Cooley, Treatise on the Constitutional Limitations (Little, Brown & Co, 1886), at 92. Perhaps the most fundamental aspect of the “legislative power,” authorized by the opening sentence of US Const, art I, § 8, which defines the powers of the legislative branch, is the power to tax and to appropriate for specified purposes. See also Const 1963, art 4. The power to tax defines the extent to which economic resources will be apportioned between the people and their government, while the power to appropriate defines the priorities of government. Partly in recognition of the enormity of these powers, the framers of our constitutions determined that the branch of *142 government to exercise these powers should be that branch which is closest to, and most representative of, the people.
This is true for other reasons as well. In contrast with the judiciary, for example, the legislature is not restricted in the range of testimony that it may hear as a prelude to enacting public policy, it is better positioned to accommodate competing policy priorities, it is better equipped to effect compromise positions after negotiation and bargaining, it is more regularly and directly accountable to the people, and its membership is more broadly representative of society and its various interests.
However, just as it is implicit in the separation of powers that each branch of government is empowered to carry out the entirety of its constitutional powers, and only these powers, it is also implicit that each branch must be allowed adequate resources to carry out its powers. Although the allocation of resources through the appropriations and taxing authorities lies at the heart of the legislative power, and thus belongs to the legislative branch, in those rare instances in which the legislature’s allocation of resources impacts the ability of the judicial branch to carry out its constitutional responsibilities, what is otherwise exclusively a part of the legislative power becomes, to that extent, a part of the judicial power. As observed by James Madison:
[M] embers of each department should be as little dependent as possible on those of the others, for the emoluments annexed to their offices. Were the executive magistrate, or the judges, not independent of the Legislature in this particular, their independence in every other would be merely nominal. [Madison, The Federalist, No. 51.]
As the legislative department alone has access to the pockets of the people, and has in some constitutions full discretion, and in all a prevailing influence over the pecu *143 niary rewards of those who will fill the other departments, a dependence is thus created in the latter, which gives still greater facility to encroachments of the former. [Madison, The Federalist, No. 48.]
In order for the judicial branch to carry out its constitutional responsibilities as envisioned by Const 1963, art 3, § 2, the judiciary cannot be totally beholden to legislative determinations regarding its budgets. While the people of this state have the right to appropriations and taxing decisions being made by their elected representatives in the legislative branch, they also have the right to a judiciary that is funded sufficiently to carry out its constitutional responsibilities.
Thus, the judiciary’s “inherent power” to compel appropriations sufficient to enable it to carry out its constitutional responsibilities is a function of the separation of powers provided for in the Michigan Constitution. The “inherent power” does not constitute an exception to the separation of powers; rather, it is integral to the separation of powers itself. What is exceptional about the judiciary’s “inherent power” is its distinctiveness from more traditional exercises of the judicial power, involving as it does determinations that directly implicate the appropriations power.
However, in order to accommodate this distinctive, and extraordinary, judicial power with the normal primacy of the legislative branch in determining levels of appropriations, the “inherent power” has always been sharply circumscribed. The “inherent power” contemplates only the power, when an impasse has arisen between the legislative and judicial branches, to determine levels of appropriation that are “reasonable and necessary” to enable the judiciary to carry out its constitutional responsibilities. However, levels of appro *144 priation that are optimally required for the judiciary remain always determinations within the legislative power.
This Court has recognized the inherent powers doctrine for over 120 years. In Stowell v Jackson Co Bd of Supervisors, 57 Mich 31; 23 NW 557 (1885), the Jackson Circuit Court deemed it necessary to house jurors in a hotel during the course of a murder trial. After the trial was over, however, the board of supervisors refused to pay for the hotel charges. This Court undertook its analysis by noting that the trial court has the power and discretion to determine whether a jury needs to be secluded. We reasoned that, because the trial court has the power to sequester the jury, it must also have the authority to bind the county funding unit to pay for that sequestration. Id. To hold otherwise “would put it in the power of a board of supervisors to prevent courts from exercising their proper functions.” Id. at 34-35.[7] Therefore, the Court concluded that, while the Legislature controls the power of the purse, “the inherent power and duty of courts to exercise their functions must authorize [payment for actions such as the sequestration] as becomes expedient in the course of judicial business.” Id. at 34.
That the judiciary’s inherent power to compel funding also extends to the appropriation of funds for employee salaries was expressed by Justice BLACK in his dissenting opinion in Wayne Circuit Judges v Wayne Co, 383 Mich 10; 172 NW2d 436 (1969) (Wayne Co I). As he *145 explained, the essence of the “inherent power” doctrine is “that the constitutionally-assigned duty of a court such as ours automatically carries with it the power and responsibility of making [continually] sure that this ‘one court of justice’ (Const 1963, art 6, § 1) functions serviceably as a co-equal branch of Michigan’s government . ...” Id. at 33. To determine whether a court can function “serviceably,” Justice BLACK indicated that the Court must first determine whether the appropriation sought by the court is necessary to address a “critical judicial need[]” and, if it is, then determine whether the amount requested is reasonable “to meet the urgency of the situation.” Id. at 34.
Less than two years later, this Court expressly adopted Justice Black’s dissenting statement in Wayne Co I. Wayne Circuit Judges v Wayne Co (On Rehearing), 386 Mich 1, 8-9; 190 NW2d 228 (1971) (Wayne Co II). In so holding, this Court concluded that
“the Judiciary must possess the inherent power to determine and compel payment of those sums of money which are reasonable and necessary to carry out its mandated responsibilities, and its powers and duties to administer Justice, if it is to be in reality a co-equal, independent Branch of our Government.” [Id. at 9, quoting Commonwealth, ex rel Carroll v Tate, 442 Pa 45, 52; 274 A2d 193 (1971) (emphasis in original).]
We further reasoned that the “inherent powers” doctrine is rooted in the constitutional command that the judicial power of this state is vested exclusively in “one court of justice. . . .” Const 1963, art 6, § 1. “The [Legislature may not abolish that court. Neither is it permissible for the [Legislature to render the court inoperative by refusing financial support.” Wayne Co II, supra at 14 (opinion by T.E. BRENNAN, J.). Thus, the judiciary has the inherent power to seek the funding *146 necessary to sustain its ability to function serviceably in carrying out its constitutional responsibilities. Wayne Co I, supra (BLACK, J., dissenting). On that basis, this Court held that Wayne County must appropriate funds for those positions “established by the law or needed in the operation of the circuit court....” Id. at 33.
Subsequent decisions make clear that the judiciary’s inherent power to compel funding is limited to those appropriations required to meet “critical judicial needs.” Wayne Co Prosecutor v Wayne Co Bd of Comm’rs, 93 Mich App 114; 286 NW2d 62 (1979). In Wayne Co Prosecutor, several county executive officers sought an injunction against budget cuts proposed by the defendant county. The Court of Appeals began its analysis by noting that, as is the case with the judiciary, a funding authority is obligated to budget sums sufficient to allow executive officers to carry out their mandated duties and obligations. However, the Court of Appeals also recognized that the courts must not involve themselves with the “truly discretionary appropriations decisions of a county board ....” Id. at 122. To balance these concerns, the Court of Appeals held that
“serviceability” [is] tbe standard to be applied in determining whether the board of commissioners has unlawfully underfunded the county executive officers so that they are unable to fulfill their statutory obligations. Serviceability must be defined in the context of Justice Black’s opinion, i.e. “urgent”, “extreme”, “critical”, and “vital” needs. A serviceable level of funding is the minimum budgetary appropriation at which statutorily mandated functions can be fulfilled. A serviceable level is not met when the failure to fund eliminates the function or creates an emergency immediately threatening the existence of the function. A serviceable level is not the optimal level. A function funded at a serviceable level will be carried out in a barely adequate manner, but it will be carried out. A function *147 funded below a serviceable level, however, will not be fulfilled as required by statute. [Id. at 124, citing Wayne Co I (Black, J., dissenting).]
This Court reiterated the limited nature of the “inherent power” doctrine in Employees & Judge of the Second Judicial Dist Court v Hillsdale Co, 423 Mich 705, 717; 378 NW2d 744 (1985). In Hillsdale Co, this Court addressed the issue of whether a funding unit could be compelled to appropriate funds for salary increases that were neither approved by it nor “proven to be necessary to maintain a statutory function of the court or to provide for the overall administration of justice.”[8] This Court began its analysis by noting that “[e]ach branch of government has inherent power to preserve its constitutional authority.” Id. On the other hand, “an indispensable ingredient of the concept of coequal branches of government is that ‘each branch must recognize and respect the limits on its own authority and the boundaries of the authority delegated to the other branches.’ ” Id., quoting United States v Will, 449 US 200, 228; 101 S Ct 471; 66 L Ed 2d 392 (1980). Thus, a lawsuit to compel funding under the “inherent powers” doctrine is limited to circumstances where “the overall operation of the court, or a constitutional function is in jeopardy because of the actions taken by the funding unit.” Hillsdale Co, supra at 717-719. This Court noted that there was no dispute that, as found by the trial court, the plaintiff trial court was functioning at a level “ ‘satisfactory to all.’ ” Id. at 722. Because *148 there was no claim that the plaintiff trial court could not exercise a statutory or constitutional function, there was no basis to resolve “the issue of when and under what standards the judiciary may compel expenditures beyond those appropriated____” Id. at 722.
Justice RlLEY wrote separately for the purpose of “set[ting] forth principled procedures to resolve, as fairly and expeditiously as possible, those conflicts which necessarily arise when the legislative branch refuses to approve funding requested by the judicial branch for reasonable and necessary court operations.” Id. at 728 (RlLEY, J., dissenting). Specifically, Justice RlLEY responded to the majority’s failure to articulate a standard against which the court’s inherent power to compel funding is to be measured. Justice RlLEY began her analysis by recognizing that the “inherent powers” doctrine was designed to preserve the balance of power between the three branches, not to upset that balance in favor of judicial supremacy. In order to protect both the county board’s power over county funds and the court’s ability to exercise the judicial power, Justice RlLEY concluded that “the judiciary must bear the burden of articulating the constitutional bases for asserting [the inherent power]” and that it must invoke the authority “with caution, in a manner that will not place in jeopardy the public’s confidence in the integrity of the judiciary.” Id. at 740. Specifically, Justice RlLEY opined that the court seeking to compel funding must “set forth specific findings of fact, identifying those judicial functions that will be in jeopardy if the appropriation requested is denied, and conclusions of law indicating why the function is required by the constitution.” Id. at 744.
We agree with Justice RlLEY that invocation of the “inherent power” of the judiciary will least disrupt the *149 constitutional balance between the judicial and legislative branches where procedures of the sort she proposes are followed. Accordingly, we adopt that portion of Justice RlLEY’s opinion that articulates the procedure that trial courts must follow in pursuit of their “inherent power.”
In litigation to compel funding, the plaintiff court must prove by clear and convincing evidence that the requested funding is both “reasonable and necessary.” Branch Co Bd of Comm’rs v Service Employees Int’l Union, 168 Mich App 340, 351; 423 NW2d 658 (1988); 17th Dist Prohate Court v Gladwin Co Bd of Comm’rs, 155 Mich App 433, 453; 401 NW2d 50 (1986). The plaintiff court seeking to compel funding must demonstrate that “the overall operation of the court, or a constitutional function is in jeopardy because of the actions taken by the funding unit.” Hillsdale Co, supra at 717-719. Finally, a court deciding an inherent powers claim must specifically set forth findings of fact identifying specifically those judicial functions that will be in jeopardy if the appropriation sought is denied, and conclusions of law indicating why such functions implicate the constitutional responsibilities of the judiciary.
B. CLEAR & CONVINCING EVIDENCE
Because the Trial Court here has failed to demonstrate by clear and convincing evidence that the enhanced benefits plan is both “reasonable and necessary” to allow that court to function serviceably in carrying out its constitutional responsibilities, we conclude that the circuit judge and the Court of Appeals clearly erred in holding that the Trial Court could compel appropriations for such plan. An appropriation is “necessary” when it is sought by the court to address a “critical judicial needQ” that affects that court’s *150 ability to function “serviceably” in carrying out its constitutional responsibilities. Wayne Co I, supra at 33-34. A “serviceable” level of funding is “the minimum budgetary appropriation at which statutorily mandated functions can be fulfilled.” Wayne Co Prosecutor, supra at 124. “A function funded at a serviceable level will be carried out in a barely adequate manner, but it will be carried out.” Id.
To justify the conclusion that the enhanced benefits plan was both “reasonable and necessary,” the circuit judge and the Court of Appeals both relied on the claims of the Chief Judge that failure to provide the enhanced benefits would negatively affect employee morale. However, we believe that the Trial Court failed to demonstrate that there existed a morale problem that impaired the court’s ability to function “serviceably” in carrying out its constitutional responsibilities. Wayne Co II.
Specifically, the Chief Judge testified that there “probably” would be people who would quit their jobs and that the Trial Court would have trouble finding new employees. However, the Chief Judge’s opinion was utterly unsupported. The Trial Court failed to demonstrate that even one person had either left its employ or was planning to leave its employ as a result of the alleged inadequacy of the preexisting benefits plan.[9] Further, the Trial Court was unable to identify even one *151 person who had refused an offer of employment because the preexisting benefits plan was inadequate.
Even assuming for the sake of argument that there was sufficient evidence to support the Chief Judge’s claim of declining morale, a claimed effect on employee morale, by itself, is not sufficient to invoke the “inherent powers” doctrine. The circuit judge and the Court of Appeals based their holdings on Gladwin Co. In Glad-win Co, the defendant funding unit determined compensation for court employees without taking into account the training, responsibilities, and duties of each position. As a result, for example, a probation officer was paid the same amount as a register, and a newly hired juvenile probation officer was paid the same wage as the defendant county’s general clerical employees. The Court of Appeals concluded that, because of the morale problems caused by this “unfair and inequitable” pay scheme, the additional appropriations for salaries for the disputed positions were “reasonable and necessary.” Id. at 454-455.
However, we note that declining employee morale alone was not the determinative factor in Gladwin Co. As noted by the Court of Appeals, the irrational pay scheme instituted by the funding unit had caused the court to fill the position of juvenile probation officer six times in less than 12 years. Further, the court had considerable difficulty attracting competent employees for the position, as demonstrated by the two occasions on which the position had gone unfilled for more than three months each. In other words, the irrational pay scheme had not just caused the court’s employees to become “demoralized,” but such morale problems had *152 specifically manifested themselves in the court’s inability to hire and retain probation officers. Accordingly, we conclude that a claim that court employees suffer from a loss of morale is insufficient to support an inherent powers claim, absent some showing that the claimed morale problems have demonstrably caused court employees to be unable to carry out their constitutional responsibilities.
Further, there is no evidence here that the productivity of court employees has diminished to such an extent that the court cannot carry out its constitutional responsibilities, or indeed that it has diminished to any extent. Rudi Edel, administrator of the Trial Court, testified that the court was not suffering from any speedy-trial problems either before or after the current funding controversy. Defendants’ appendix at 1452a-1453a.[10] In fact, the court has continued to process its civil and criminal dockets adequately.[11] Id. Moreover, an *153 audit conducted by the State Court Administrative Office determined that the Trial Court’s quality control is “excellent.” Thus, unlike in Gladwin Co, there is no evidence that the claimed morale problems rendered the court incapable of carrying out any of its essential judicial functions. Even if we accept the Chief Judge’s unsupported statements that some court employees may have “one eye on another job” and will be “unhappy,” the Trial Court has failed to demonstrate that those employees are unable to perform their jobs. In fact, the Trial Court’s own expert testified that the employees were functioning “within the ranges that are expected to be there by the State.” Plaintiffs appendix at 852b.[12] Further, the Chief Judge admitted that his staff was “soldiering on” even in light of the potential loss of the enhanced benefits plan. In other words, even assuming that the employees were dissatisfied or unhappy, the Trial Court was, in fact, able to function as a court even without the enhanced benefits plan. The question in an inherent powers case is not whether all court employees are “satisfied” or “happy,” but, rather, whether they are able to perform their jobs in a manner that allows the Trial Court to function “serviceably” in carrying out its constitutional responsibilities.
*154 Also, the Chief Judge admitted at trial that he specifically asked for “the best [pension] plan that’s available.” Trial transcript at 342. In other words, the requested appropriation, by its own terms, comprises the maximum necessary to improve employee morale, not what was “reasonable and necessary” to ensure that its employees could carry out the Trial Court’s constitutional responsibilities.
Finally, any claimed morale problems that did exist among the Trial Court’s employees seem predicated upon the Chief Judge’s own unilateral promise to provide the enhanced benefits.[13] To this extent, the Trial Court is seeking to require the counties to pay for a problem that it has arguably created. It cannot be that a court can claim a “morale problem” where the alleged problem is a function of unwarranted promises of benefit increases that it has made to its employees. Under the circuit judge’s reasoning in this regard, any court could seek to invoke its “inherent power” to compel its funding unit to make an appropriation *155 beyond what it was prepared to make— no matter how unreasonable or unnecessary— solely on the basis of such a unilateral promise. To adopt such a position would not maintain the balance of powers between the legislative and judicial branches— as the “inherent powers” doctrine is designed to do— but would instead impose a doctrine of judicial supremacy in favor of the branch of government least suited to make policy-driven appropriations and taxing decisions.[14]
In light of insufficient evidence that the appropriation for enhanced benefits sought by the Trial Court was “necessary” to the ability of the court to function “serviceably” in carrying out its constitutional responsibilities, the Trial Court has failed to establish a right to compel funding from the defendants under the “inherent powers” doctrine.[15] Therefore, any increased benefits for the employees of the Trial Court must come through the ordinary processes of negotiation and bargaining between the Trial Court and the representatives of the people on the Crawford, Kalkaska, and Otsego county boards of commissioners; such benefits are not properly obtained by judicial order.
C. CONTRACT CLAIMS
Although we conclude that the requested appropriation was not “necessary” to allow the Trial Court to function “serviceably” in carrying out its constitutional *156 responsibilities, we must also address the lower courts’ alternative conclusion that defendants are contractually obligated to appropriate funding for the enhanced benefits plan.
Administrative Order No. 1998-5, 459 Mich clxxviclxxvii, provides in pertinent part:
A court must submit its proposed and appropriated annual budget and subsequent modifications to the State Court Administrator at the time of submission to or receipt from the local funding unit or units. The budget submitted must be in conformity with a uniform chart of accounts. If the local funding unit requests that a proposed budget be submitted in line-item detail, the chief judge must comply with the request.... A chief judge may not enter into a multiple-year commitment concerning any personnel economic issue unless: (1) the funding unit agrees, or (2) the agreement does not exceed the percentage increase or the duration of a multiple-year contract that the funding unit has negotiated for its employees....
If, after the local funding unit has made its appropriations, a court concludes that the funds provided for its operations by its local funding unit are insufficient to enable the court to properly perform its duties and that legal action is necessary, the procedures set forth in this order must be followed.
Our primary task in construing a statute is to discern and give effect to the intent of the Legislature. Sun Valley Foods Co v Ward, 460 Mich 230, 236; 596 NW2d 119 (1999). “The words of a statute provide ‘the most reliable evidence of its intent....’” Id., quoting United States v Turkette, 452 US 576, 593; 101 S Ct 2524; 69 L Ed 2d 246 (1981). This Court must consider “both the plain meaning of the critical word or phrase as well as ‘its placement and purpose in the statutory scheme.’ ” Sun Valley, supra at 237, quoting Bailey v United *157 States, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995). “The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended.” Sun Valley, supra at 237. “If the language of the statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written.” Id. at 236. “[T]he same principles of statutory construction apply in determining [this Court’s] intent in promulgating rules of procedure ....” People v Davis, 181 Mich App 354, 356; 448 NW2d 842 (1989).
As noted above, the Constitution imposes a duty on a county board of commissioners to appropriate funds “reasonable and necessary” to allow the court to function serviceably in carrying out its constitutional responsibilities. Once the board of commissioners has made a funding determination, AO 1998-5 imposes a duty on the court not to exceed either the total amount appropriated by the board or the amount specified in a line-item appropriation. Where the total or line-item appropriation is insufficient, the court must follow the procedures set forth in AO 1998-5. A trial court may only challenge a funding decision made by a county board if “the funds provided for its operations ... are insufficient to enable the court to properly perform its duties . . . .” Id. Thus, the county board’s appropriations to the judiciary can be challenged either through the political process, i.e., by seeking an additional appropriation from the board, or through the legal process, when the board has failed to appropriate enough money to allow the court to function serviceably in carrying out its constitutional responsibilities. However, if it decides not to exercise either of these two options, a trial court must live within the budget appropriated by its board.
*158 The circuit judge and the Court of Appeals majority concluded that a county board could also be bound by contract to appropriate a certain level of funding to its trial courts. However, the county board has a preexisting constitutional duty to appropriate a serviceable level of funding to its trial courts. An essential element in a contract claim is legal consideration. Yerkovich v AAA, 461 Mich 732, 740; 610 NW2d 542 (2000). “Under the preexisting duty rule, it is well settled that doing what one is legally bound to do is not consideration for a new promise.” Id. at 740-741. Such a contract would appear to fail for lack of consideration. Puett v Walker, 332 Mich 117, 122; 50 NW2d 740 (1952). In other words, because the county board has a preexisting duty to appropriate a serviceable level of funding to its court, a county cannot be compelled under contract law to appropriate “reasonable and necessary” funds to enable the court to function serviceably in carrying out its constitutional responsibilities.
Moreover, there was no “meeting of the minds” between the Trial Court and Crawford County because the terms of the retiree health care plan were altered after the Crawford County resolution was passed. West Bloomfield Hosp v Certificate of Need Bd (On Remand), 223 Mich App 507, 519; 567 NW2d 1 (1997). Here, the resolution passed by Crawford County authorized a $4,087 cap on payments made in the first year of the benefit program. However, the actual first year cap was $5,763. The board never amended the resolution to reflect that new figure, and never voted on any amended resolution. The circuit judge and the Court of Appeals majority held that the resolution constituted a valid acceptance of the Trial Court’s offer because “[t]he annual payment cap was not an essential term.” 266 Mich App at 160. We disagree. One of the principal concerns raised by Crawford County was that the *159 retiree health care plan would create “massive liabilities [for Crawford County] in the future.” Defendants’ appendix at 330a. A higher first-year premium would exacerbate these concerns, because the health care plan would potentially have to pay an extra $1,676 for each person covered by the plan in the first year. Obviously, if the fund is required to pay a higher annual premium, the amount of money set aside for the benefit would be depleted faster than anticipated when the board passed its resolution. We conclude that the unambiguous language of the resolution is consistent with the understanding that Crawford County was willing to agree to the plan only if the starting health insurance cost was $4,087 for each employee. Because this figure was not the eventual starting cost of the health insurance, there was simply no meeting of the minds and therefore no contract. Further, no one disputes that the enhanced benefits plan could not have been implemented without the consent of all three funding units. Because the purported contract fails with respect to Crawford County inasmuch as there was no meeting of the minds, any contract between the Trial Court and the other funding units for the enhanced benefits plan must also fail.
In summary, a county board’s duty to appropriate funds to the judiciary arises from the Constitution. Because a county has a preexisting duty to fund its trial courts, a county cannot enter into a contract with the Trial Court to fund the enhanced benefits plan at a specific level. Moreover, the purported contract fails with respect to Crawford County because there was no meeting of the minds. Because all three funding units had to agree to implement the enhanced benefits plan, any contract between the Trial Court and the other funding units for the enhanced benefits plan must also fail.
*160 IV CONCLUSION
We conclude that the Michigan Constitution only permits the judicial branch to directly compel the legislative branch to appropriate when a court has not received sufficient funding to operate at a serviceable level. Hillsdale Co, supra at 722. A court deciding an “inherent power” claim must set forth findings of fact identifying specifically those judicial functions that will be in jeopardy if the appropriation requested is denied, and conclusions of law indicating why such functions implicate the constitutional responsibilities of the judiciary. We hold that the Trial Court here has failed to demonstrate by clear and convincing evidence that the requested appropriation for enhanced benefits was “reasonable and necessary” to the “serviceability” of the court. The Trial Court has failed to produce any evidence that even one employee was planning to leave if the enhanced benefits were not adopted or that anyone has refused to accept employment with the court because of the preexisting benefits plan. Moreover, the evidence demonstrates that the Trial Court has continued to carry out its essential judicial functions adequately. While the Trial Court may or may not have been functioning “happily” or “optimally,” it is nonetheless reasonably functioning, which is all that is required to preclude the exercise of the judiciary’s “inherent power.”
We also conclude that because a county has a preexisting constitutional duty to fund its courts, the defendant counties could not enter into a contract with the Trial Court to fund the enhanced benefits plan at a specific level. Moreover, the purported contract fails with respect to Crawford County because there was no meeting of the minds. Since all three funding units had to agree to implement the enhanced benefits plan, any *161 contract between the Trial Court and the other funding units for the enhanced benefits plan must also fail.
Accordingly, we reverse the judgment of the Court of Appeals and remand this matter to the circuit judge for entry of judgment in favor of the defendant counties. Increased public employee benefits in defendant counties must be enacted through the democratic processes of government— through the decision-making of the legislative branch— not by judicial order.
Taylor, C. J., and YOUNG, J., concurred with Markman, J.

 The other courts included in the demonstration project were the 83rd District Court, to the extent it served Crawford County; the 87th District Court, to the extent it served Kalkaska and Otsego counties; the Crawford County Probate Court; the Kalkaska County Probate Court; and the Otsego County Probate Court.

 The demonstration project was originally scheduled to last only two years and encompassed six project courts: Barry County, Berrien County, Isabella County, Lake County, Washtenaw County, and the 46th Circuit Court. However, pursuant to Administrative Order No. 1997-12, 456 Mich clxxxi, the project was extended “until further order of the [Supreme] Court.” Iron County was added as a seventh demonstration project court in 1999. In 2002, the Legislature enacted MCL 600.401 et seq., which permits a county or judicial circuit to consolidate all or part of its operations subject to the approval of this Court. In January 2003, this Court adopted Administrative Order No. 2003-1, 467 Mich cix, which *136 provides in part that “[s]ubject to approval of the Supreme Court, a plan of concurrent jurisdiction may be adopted by a majority vote of judges of the participating trial courts.”

 Crawford County Commissioner Scott Hansen also noted that the board rejected the contract because it was “not what [the board] approved [on August 29, 2000.]” Defendant’s appendix at 435a.

 Kalkaska County paid its full share of the Trial Court’s budget in both 2001 and 2002. It failed to appropriate funds for its share of the enhanced benefits plan for fiscal year 2003.

 Judge Zahra, concurring in part and dissenting in part, opined that defendants had a preexisting statutory and constitutional duty to provide the Trial Court with sufficient funding to carry out its constitutional responsibilities. Because of this, the Trial Court’s contract claim failed for lack of consideration. In addition, he observed that there was no statutory or other authority underlying the contract claims between courts and their funding units.

 In addition to affirming the judgment of the circuit judge on the Trial Court’s contractual and “inherent power” claims, the Court of Appeals resolved a number of other issues, including the Trial Court’s entitlement to attorney fees. Applications for leave to appeal from those matters have been held in abeyance by this Court for resolution of the instant case. Crawford Co v Otsego Co, 707 NW2d 350 (2005); 46th Circuit Trial Court v Crawford Co, 707 NW2d 351 (2005); Crawford Co v Otsego Co, 707 NW2d 351 (2005); 46th Circuit Trial Court v Crawford Co, 707 NW2d 594 (2005).

 Importantly, this Court noted that “[i]t would he very unsafe, and might imperil the validity of a conviction, if the care of the jury should be left to the discretion of an officer.” Id. at 32-33. In other words, the power to sequester a jury, and the corresponding power to demand payment from the funding authority to pay for that sequestration, plays a vital role in a court’s ability to conduct criminal trials and, therefore, to exercise its constitutionally mandated responsibilities.

 In the companion case, Cheboygan Co Bd of Comm’rs v Cheboygan Circuit Judge, the Cheboygan Circuit Court sought to compel funding for a part-time mediation clerk. However, at issue in Cheboygan Co was the question of whether a trial court may employ an administrative order to compel funding in excess of the court’s appropriation. This Court concluded that the use of an administrative order was inappropriate under MCE 8.112(B).

 The dissent argues that the testimony of Rudi Edel, the Trial Court’s administrator, that “six [employees] left for wages and benefits” supports the circuit judge’s conclusion that the enhanced benefits plan was “reasonable.” Post at 169. However, when Edel was asked, “How many [of the six employees] told you that the reason they were leaving was for better retirement plans?” he could not identify even one such person. Defendants’ appendix at 1468a. Further, one of the Trial Court’s judges, Judge Dennis Murphy, testified at a deposition that he had never heard *151 either directly or indirectly of any employee who had quit or contemplated quitting their job in the event they did not receive a better pension plan. Id. at 1225a.

 Edel further acknowledged that, with current staffing levels, the Trial Court is “getting our work done, our mandated and reasonable and necessary functions.” Plaintiffs appendix at 700b (emphasis supplied).

 Edel testified that the Trial Court was not complying with at least one administrative order of this Court, three or four federal statutes, and three or four state statutes. Trial Transcript Vol 1 at 284 According to the dissent, this evidence supports the circuit judge’s findings of fact. Post at 170-171. However, there was no evidence to suggest that the Trial Court was fulfilling these requirements before the instant controversy. Moreover, the requested appropriation is for retiree benefits and would not result in a single additional person being hired. The dissent opines that “people do choose jobs on the basis of adequacy or inadequacy of retiree benefits.” Post at 171. Doubtless, employees rely on any number of factors in choosing jobs. While retirement benefits undeniably are within a broad range of factors an employee considers in deciding whether to accept an offer of employment, there is no demonstrated impact in this case of the absence of additional such benefits upon the Trial Court’s ability to fulfill its constitutional and statutory obligations. Accordingly, the appropriation at issue is not “reasonable and necessary” in the sense that the judicial branch can impose this appropriation upon unwilling counties as part of its inherent powers.

 The expert, Ross Childs, who is the county executive of Grand Traverse County, testified:
I looked at the budgets that were prepared. I read some of the documents. I looked at it and made an assessment as to whether there was what I thought “fat” in the budget. I didn’t see a lot of fat in the budget. I looked at the caseloads and I went through the State Court Administrator’s Officer and looked at the reports that were there, the assignments and the staff and the caseload per staff for caseworkers in the Friend of the Court and probation officers and so on were consistent; that they are well in — within the ranges that are expected to be there by the State. I didn’t find the fat in the budget. [M]

 The dissent argues that it was the counties’ decision to renege on the agreement, and not the Chief Judge’s unilateral promises, that created the alleged morale problems. Post at 173-174. However, when the Chief Judge implemented the benefits plan by order in December 2000, he did so knowing that Crawford County was unwilling to go along. This was established in a September 29, 2000, letter by the Chief Judge to the county boards of commissioners, which stated that “should the contract fail to be executed prior to the year’s end, issues regarding wages and longevity bonuses will have to be revisited.” Defendant’s appendix at 1695a. This was also established in a November 2000 letter by the Chief Judge to the county boards of commissioners, which recognized that “Crawford County is still considering that matter” and that “we must conclude our arrangement early in the month of December.” Defendants’ appendix at 414a-415a. Had Crawford County already agreed to the purposed benefits, as the dissent asserts, Crawford County would not have needed to “consider” anything and there would have been no need to “revisit” the wage and longevity pay concessions made by the Trial Court’s employees.

 Indeed, we note that Kalkaska County’s request for an additional one mill of taxation to fund the Trial Court’s retirement expenses was overwhelmingly defeated by the voters in that county, with 4,415 votes against the proposal to 568 votes in favor of the proposal. Defendants’ appendix at 1371a.

 Because we conclude that the enhanced benefits were not “necessary,” we need not determine whether those benefits were a reasonable means “to meet the urgency of the situation.” Wayne Co I, supra at 33-34 (Black, J., dissenting).