# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

UAW v GREEN

Docket No. 147700. Argued January 13, 2015 (Calendar No. 1). Decided July 29, 2015.

The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America and others brought an action in the Court of Appeals against Nino E. Green and other members of the Michigan Employment Relations Commission, the Governor, and the Attorney General, seeking a declaratory judgment that portions of 2012 PA 349—which amended the public employment relations act (PERA), MCL 423.201 *et seq*., to prohibit public employers from requiring their employees to join a union or pay union-related expenses—were unconstitutional with respect to employees in the classified state civil service. The Court of Appeals, SAAD, P.J., and DONOFRIO, J. (GLEICHER, J., dissenting), held that the challenged portions of 2012 PA 349 were constitutional. 302 Mich App 246 (2013). The Supreme Court granted plaintiffs' application for leave to appeal. 495 Mich 921 (2014).

In an opinion by Chief Justice YOUNG, joined by Justices MARKMAN, ZAHRA, and VIVIANO, the Supreme Court *held*:

The Civil Service Commission lacked the constitutional authority to compel civil service employees to make involuntary financial contributions to subsidize the Commission's exercise of its constitutional duties and responsibilities. Although the Commission had authority over civil service employees' rates of compensation, conditions of employment, and grievance procedures under Const 1963, art 11, § 5, the Commission's power to regulate the conditions of employment through public collective bargaining agreements did not encompass the specific authority to tax or appropriate, which generally rested exclusively with the Legislature unless the Constitution affirmatively provided that power to another constitutional body. The funding provision of Const 1963, art 11, § 5, ¶ 10 indicated that the ratifiers understood that the Commission would be adequately funded by the Legislature in proportion to the size of the civil service and, therefore, that the Commission lacked the power to compel funding for its administrative operational duties from another and unstated source. Accordingly, allowing the imposition of mandatory agency shop fees on civil servants under Civil Service Rule 6-7.2 was beyond the Commission's constitutional authority. *Dudkin v Civil Serv Comm*, 127 Mich App 397 (1983), was overruled to the extent it held that the imposition of an agency shop fee was constitutionally authorized pursuant to efficient civil service operations.

Court of Appeals judgment affirmed on different grounds.

Justice KELLY, joined by Justices MCCORMACK and BERNSTEIN, dissenting, would have reversed the Court of Appeals judgment, upheld the authority of the commission to promulgate Civil Service Rule 6-7.2 as part of its power to regulate all conditions of employment in the classified civil service and to determine the qualifications of all candidates for positions in the classified service under Const 1963, art 11, § 5, and held that Const 1963, art 4, § 48 precluded 2012 PA 349 from applying to employees in the state classified civil service.

©2015 State of Michigan

# OPINION

Chief Justice:    Justices:
Robert P. Young, Jr.    Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein

FILED July 29, 2015

S T A T E  O F  M I C H I G A N

SUPREME COURT

INTERNATIONAL UNION, UNITED
AUTOMOBILE AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA et al.,

       Plaintiffs-Appellants,

v                      No. 147700

NINO E. GREEN et al.,

       Defendants-Appellees.

BEFORE THE ENTIRE BENCH

YOUNG, C.J.

     The Civil Service Commission's rules allow public collective bargaining agreements that require collection of a mandatory service fee, also known as an "agency shop fee," from union-eligible employees who opt out of union membership. Civ Serv R 6-7.2. Although we conclude that public collective bargaining is a method by which the Civil Service Commission (the commission) may choose to exercise its constitutional duties, we hold that the commission may not effectively require civil servants to fund the

commission's own administrative operations.  Accordingly, we affirm, albeit on different grounds, the judgment of the Court of Appeals.

FACTS AND HISTORY

The legislation commonly known as the "Right to Work" laws—Public Acts 348 and 349 of 2012—were made effective March 27, 2013.  2012 PA 348 governs private employers and 2012 PA 349 governs public employers.  This case concerns the constitutionality of 2012 PA 349.  Section 3 of 2012 PA 349 amends the public employment relations act (PERA), MCL 423.201 *et seq*., to provide that public employers may not require their employees to join a union or pay union dues, fees, or other expenses "as a condition of obtaining or continuing public employment . . . ." MCL 423.210(3) ("[A]n individual shall not be required as a condition of obtaining or continuing public employment to do any of the following: . . . (c) [p]ay any dues, fees, assessments, or other charges or expenses of any kind or amount, or provide anything of value to a labor organization or bargaining representative.").

The commission's current rules, however, affirmatively and expressly allow public collective bargaining agreements that provide for the collection of an agency shop fee from union-eligible employees who opt out of union membership.  Civil Service Rule 6-7.2 (last amended April 29, 2004) provides:

> Nothing in this rule precludes the employer from making an agreement with an exclusive representative to require, as a condition of continued employment, that each eligible employee in the unit who chooses not to become a member of the exclusive representative shall pay a service fee to the exclusive representative.  If agreed to in a collective bargaining agreement, the state may deduct the service fee by payroll deduction.  An appointing authority shall not deduct a service fee unless the employee has

2

filed a prior written authorization or as otherwise authorized in a collective bargaining agreement.

Plaintiffs, union representatives of classified civil service employees, contend that agency shop fees defray various union activity costs. In accordance with the current rules, plaintiff unions have negotiated various agreements with the state that contain agency shop fee arrangements covering the employees whom they represent.

2012 PA 349 purports to make these mandatory agency shop fees illegal. Plaintiff labor unions filed the instant complaint in February 2013 challenging the validity of 2012 PA 349, § 3.[1] Plaintiffs alleged that, under Const 1963, art 11, § 5, the statute's agency shop fee prohibition cannot apply to the commission because it infringes the commission's constitutional mandate to "regulate all conditions of employment" for civil servants.

The Court of Appeals in a split decision held that the Legislature possesses the authority to enact legislation concerning and restricting agency shop fees. *Int'l Union v Green*, 302 Mich App 246; 839 NW2d 1 (2013). In reaching that conclusion, the Court of Appeals reasoned that the commission's power to "regulate" conditions of employment is necessarily subservient to the Legislature's power to "enact laws" relative to hours and conditions of employment. The dissent, on the other hand, would have held that agency shop fees are "conditions of employment" by virtue of being "on-duty employment concerns." *Id*. at 294 (GLEICHER, J., dissenting).

---

[1] Under § 10(6) of 2012 PA 349, the Court of Appeals exercises exclusive original jurisdiction over such actions. MCL 423.210(6).

STANDARD OF REVIEW

Questions of constitutional and statutory interpretation are reviewed de novo. *Hunter v Hunter*, 484 Mich 247, 257; 771 NW2d 694 (2009).

ANALYSIS

Our primary goal in construing a constitutional provision is to give effect to the intent of the people of the state of Michigan who ratified the Constitution, by applying the rule of "common understanding." See *Goldstone v Bloomfield Twp Pub Library*, 479 Mich 554, 558-559; 737 NW2d 476 (2007) ("When interpreting constitutional provisions, our primary objective is to realize the intent of the people by whom and for whom the constitution was ratified. That is, we seek the 'common understanding' of the people at the time the constitution was ratified. This involves applying the plain meaning of each term used at the time of ratification, unless technical, legal terms are used.") (citations and quotation marks omitted). We identify the common understanding of constitutional text by applying the plain meaning of the text at the time of ratification. *Wayne Co v Hathcock*, 471 Mich 445, 468-469; 684 NW2d 765 (2004). Interpretation of a constitutional provision also takes account of "the circumstances leading to the adoption of the provision and the purpose sought to be accomplished." *People v Tanner*, 496 Mich 199, 226; 853 NW2d 653 (2014) (citation and quotation marks omitted). Unless we are able to determine that a constitutional provision had some other particularized or specialized meaning in the collective mind of the 1963 electorate, we must give effect to the natural meaning of the language used in the Constitution. *Mich United Conservation Clubs v Secretary of State (After Remand)*, 464 Mich 359, 376; 630 NW2d 297 (2001) (YOUNG, J., concurring). Technical legal terms are those that have acquired a special

4

meaning and "must be interpreted in light of the meaning that those sophisticated in the law would have given those terms at the time of ratification." *Dep't of Transp v Tomkins*, 481 Mich 184, 191; 749 NW2d 716 (2008). The Address to the People, which was distributed to Michigan citizens in advance of the ratification vote and which explained in everyday language what each provision of the proposed new Constitution was intended to accomplish, *Walker v Wolverine Fabricating & Mfg Co, Inc*, 425 Mich 586, 597; 391 NW2d 296 (1986), and, to a lesser degree, the constitutional convention debates themselves are also relevant in determining the ratifiers' intent. *Lapeer Co Clerk v Lapeer Circuit Court*, 469 Mich 146, 156; 665 NW2d 452 (2003).

"The Civil Service Commission is a constitutional body . . . ." *Viculin v Dep't of Civil Serv*, 386 Mich 375, 393; 192 NW2d 449 (1971). It possesses "plenary and absolute powers in its field." *Id*. at 398. The constitutional provision concerning the commission, article 11, § 5, provides, in relevant part:

> The Commission shall classify all positions in the classified service according to their respective duties and responsibilities, fix rates of compensation for all classes of positions, approve or disapprove disbursements for all personal services, determine by competitive examination and performance exclusively on the basis of merit, efficiency and fitness the qualifications of all candidates for positions in the classified service, make rules and regulations covering all personnel transactions, and regulate all conditions of employment in the classified service. [Const 1963, art 11, § 5, ¶ 4.]

Article 11, § 5 thus sets forth the "duties of the Civil Service Commission[.]" See *Mich Coalition of State Employee Unions v Civil Serv Comm*, 465 Mich 212, 221; 634 NW2d 692 (2001). The commission possesses authority over and exercises its duties concerning, in part, "the procedures by which a state civil service employee may review

5

his grievance," *Viculin*, 386 Mich at 393, as well as rates of compensation and conditions of employment. See *Council No 11, AFSCME v Civil Serv Comm*, 408 Mich 385, 406; 292 NW2d 442 (1980).

The commission's rules authorize the use of public collective bargaining agreements as a mechanism for exercising its constitutional authority over such matters as grievance procedures and rates of compensation. See, e.g., Civ Serv R 6-9.6(a) ("An exclusive representative and the employer may agree upon a procedure for the resolution of grievances of exclusively represented employees against the departmental employer . . ."); Civ Serv R 6-3.6(b) ("The rates of compensation for all existing grades within a classification of positions . . . may be established in a collective bargaining agreement . . ."). The commission retains absolute authority over the contents of a public collective bargaining agreement. Civ Serv R 6-3.1(b) ("The civil service commission retains the authority to (1) approve, modify, or reject, in whole or in part, a proposed collective bargaining agreement presented to it for review and (2) to impose on the parties and eligible employees a collective bargaining agreement as modified by the commission."). This authority makes clear that the commission uses public collective bargaining as one important tool within its constitutional arsenal, establishing a procedure by which civil servants and the state employer may bargain over a variety of employment-related matters. This choice presumably reflects the commission's judgment that it wishes to facilitate input from the employees' representatives. If the commission deems public collective bargaining to be an appropriate mechanism for exercising its constitutional duties, that is its prerogative and we have no warrant to challenge this aspect of its exercise of authority. See *Makowski v Governor*, 495 Mich

6

465, 471; 852 NW2d 61 (2014), citing *Marbury v Madison*, 5 US (1 Cranch) 137, 170; 2 L Ed 60 (1803) (applying *Marbury* to Michigan's three branches of government and stating that "courts may not inquire into how the executive or his officers perform their duties in which they have discretion").

Having established for the purposes of this case that the commission may authorize public collective bargaining as a tool in the exercise of its constitutional duties, we turn to the specific issue before us: whether the mandatory agency shop fee is consistent with such authorization. Although authorizing public collective bargaining agreements is within the commission's sound judgment, we hold that the commission *lacks* the authority to tax or appropriate—to wit, the authority to compel civil service employees to make involuntary financial contributions to subsidize the commission's exercise of its constitutional duties and responsibilities.

Generally, of course, the power to tax and appropriate rests exclusively with the Legislature. See *46th Circuit Trial Court v Crawford Co*, 476 Mich 131, 141; 719 NW2d 553 (2006) (opinion by MARKMAN, J.); see also Const 1963, art 9, § 1 ("The legislature shall impose taxes sufficient with other resources to pay the expenses of state government."). It has been stated:

> The power to tax defines the extent to which economic resources will be apportioned between the people and their government, while the power to appropriate defines the priorities of government. Partly in recognition of the enormity of these powers, the framers of our constitutions determined that the branch of government to exercise these powers should be that branch which is closest to, and most representative of, the people [i.e., the Legislature]. [*46th Circuit Trial Court*, 476 Mich at 141-142. (opinion by MARKMAN, J.)]

7

Indeed, we have recognized that this is "the most fundamental aspect of the 'legislative power . . . .' " *Id.* at 141 (opinion by MARKMAN, J.). Therefore, in order for another constitutional body, such as the commission, to exercise the same powers that are historically vested in our Legislature, the Constitution must affirmatively provide for them. See *Soap & Detergent Ass'n v Natural Resources Comm*, 415 Mich 728, 752-753; 330 NW2d 346 (1982).

In an unrelated, but illustrative, context, the commission actually enjoys such a narrow and highly distinctive power of appropriation. Paragraph 7 of Const 1963, art 11, § 5, expressly empowers the commission to increase civil servants' rates of compensation by having that increase placed into the state's annual budget. That increase becomes effective unless the Legislature vetoes the commission's increase by a supermajority vote. In turn, when the commission opts to increase the payroll of employees in the civil service, the Constitution automatically increases the commission's own administrative operational budget in direct proportion to the payroll increase. Const 1963, art 11, § 5, ¶¶ 7, 10. Specifically, paragraph 10 of Const 1963, art 11, § 5 provides:

> To enable the commission to exercise its powers, the legislature shall appropriate to the commission for the ensuing fiscal year a sum not less than one per cent of the aggregate payroll of the classified service for the preceding fiscal year, as certified by the commission. Within six months after the conclusion of each fiscal year the commission shall return to the state treasury all moneys unexpended for that fiscal year.

At the constitutional convention, this—the commission's "privilege of a mandatory [administrative operational] appropriation"—was rightfully described as "extraordinary." 1 Official Record, Constitutional Convention 1961, p 639 (stating that "[t]he commission

8

does not appear to have abused its extraordinary privilege of a mandatory appropriation" in order to raise the payroll and, by extension, its own budget).

But the commission's limited and explicit power to appropriate its own administrative funding by adjusting budgeted rates of compensation stands in stark contrast to an asserted broad and implicit power to appropriate funds from whatever source. The former has textual support in the Constitution, while the latter does not. There is simply no authority in the Constitution that would support an argument that its ratifiers commonly and reasonably understood the commission as possessing the authority that plaintiffs ascribe to it—in particular, the power to require that assessments from civil servants' paychecks additionally subsidize the commission's own duties and responsibilities.

Reading this administrative funding provision in article 11, § 5, ¶ 10 in context with the enumeration of the commission's powers in ¶ 4 underscores that the ratifiers could not have contemplated that civil servants would serve as an alternative or additional source of funding for the commission's budget. The *only* potential source of an authority to permit mandatory agency shop fees is the commission's power to "regulate" the conditions of employment, which regulation is effected through public collective bargaining agreements. But the power to "regulate" does not encompass the specific authority to compel other entities, including civil servants themselves, to subsidize the commission's constitutional operations. This authority is one of taxation and appropriation and is fundamentally legislative in character.

Indeed, the presence of the funding provision of article 11, § 5, ¶ 10 serves to confirm this analysis, which concludes that the ratifiers must have understood, consistent

9

with separation of powers principles, that the commission would be adequately funded by the Legislature in proportion to the size of the civil service. In that paragraph, the Constitution provides the commission with the financial means "[t]o enable the commission to exercise its powers[.]" In other words, upon receiving an operating appropriation, which is scaled to one percent of the total payroll of all classified civil servants, the Constitution considers the commission "enable[d]" to exercise all of its powers—including its power to "regulate all conditions of employment in the classified service." In light of the foregoing, the commission cannot simply provide itself with additional administrative operating funds as a function of its authority to "regulate."[2] Instead, because the Constitution provides the commission with a source of funding "to enable [it] to exercise its powers," the ratifiers must have reasonably understood that to be the commission's *exclusive* source of funding. See *Blank v Dep't of Corrections*, 462 Mich 103, 142 n 14; 611 NW2d 530 (2000) (MARKMAN, J., concurring) ("There is nothing unusual about the principle that language couched in terms of an affirmative grant can also reasonably imply a restriction."); see also Cooley, Constitutional Limitations (1868), p 64 ("[W]here the means for the exercise of a granted power are given, no other or different means can be implied, as being more effective or

---

[2] It may seem excessive to suggest that the commission might someday seek to use compelled contributions from civil servants in order to cover administrative costs *other* than those associated with public collective bargaining. However, absent affirmative constitutional authority, the premise of the commission's supposed power to assess agency shop fees from civil servants has no apparent or necessary limiting principle that would preclude such an action.

convenient.") (citation and quotation marks omitted). It follows then that the commission lacks the power to compel funding for its administrative operational duties from another and unstated source. Accordingly, we hold that allowing the imposition of mandatory agency shop fees upon civil servants is beyond the commission's constitutional authority.[3] Civil Service Rule 6-7.2 is unconstitutional to the extent it allows the exaction of such fees.[4]

## RESPONSE TO THE DISSENT

The dissent does not disagree with our conclusion that the commission lacks the authority to demand additional administrative operating funds from third parties. Rather, it is the dissent's position that, because employees are forced to pay the agency shop fees *directly to the unions*, rather than to the commission itself, the fees "do not fund the commission's 'administrative operational duties' to establish the conditions of

---

[3] Because the commission's power to "regulate" does not encompass the general legislative authority to tax or appropriate, we overrule *Dudkin v Civil Serv Comm*, 127 Mich App 397, 408-409; 339 NW2d 190 (1983), to the extent that it held that "imposition of an agency shop fee" is constitutionally authorized "pursuant to efficient civil service operations."

[4] Given our holding that the commission may not impose mandatory agency shop fees on civil servants because it lacks the affirmative constitutional authority to do so under Const 1963, art 11, § 5, we need not consider whether it is also prohibited by 2012 PA 349 from doing the same. Thus, we need not address the meaning and breadth of "conditions of employment" in article 4, § 49 and article 11, § 5, or how the commission's authority in article 11, § 5 to "regulate all conditions of employment in the classified service" should be reconciled with the Legislature's authority in article 4, § 1 to exercise "[t]he legislative power of the State of Michigan" and its authority in article 4, § 49 to "enact laws relative to . . . conditions of employment." Furthermore, there is no need to address plaintiffs' argument that 2012 PA 349 is inapplicable to civil servants as a function of its placement within PERA.

11

employment" as we have reasoned.[5] We respectfully argue that the dissent misses the point of our analysis.

The fact that, here, the agency fees are paid to the union does not change the fact that the commission permits collective bargaining in order to fulfill *its* constitutional obligation to regulate conditions of employment. Thus, using collective bargaining for that purpose provides a benefit that flows directly to the commission.[6] Contrary to the dissent's assertion that "there has been no finding—not even an allegation—that agency fees fund [the commission's] regulatory efforts,"[7] the commission's own rules link collective bargaining *directly* to conditions of employment. Under Civil Service Rule 6-2.1(d), "[t]he provisions of a collective bargaining agreement, when approved by the commission, *become a subset of the civil service rules governing . . . conditions of employment* for the eligible employees in the applicable unit."[8] This is underscored by the commission's absolute control over collective bargaining agreements, which renders them merely advisory until approved by the commission and illustrates that the *commission* is the true beneficiary of the collective bargaining process it has authorized in order to fulfill its constitutional regulatory obligation. Although the employers and

---

[5] *Post* at 7.

[6] Specifically, collective bargaining agreements relieve the commission of the burden of its constitutional responsibility to regulate particularized "conditions of employment for the eligible employees in the applicable unit." Civ Serv R 6-2.1(d).

[7] *Post* at 8.

[8] Emphasis added.

12

employees may benefit from collective bargaining, those entities enjoy any such positive externalities at the grace of the commission.

As explained earlier, collective bargaining is one method by which the commission has chosen to exercise its obligation to "regulate all conditions of employment." And this is the critical point in our analysis that explains why the commission is the true beneficiary of the collective bargaining process: Unless collective bargaining was a proper method of regulating conditions of employment within the civil service, there would be no lawful basis for the commission to permit it at all. Stated differently, because the commission can permit collective bargaining, it follows that it does so as part of its own duty to regulate. The agency fees in turn exist to support that regulatory duty, regardless of who receives them.

Having chosen this method of regulating conditions of employment, what the commission cannot do is foist the administrative costs of that choice onto anyone else. This principle remains true regardless of who pays whom. What matters is who authorizes and receives the benefit. Illustratively, had the commission chosen another method by which to regulate conditions of employment—for example, by hiring a panel of consultant labor economists—no one would assert that the labor economists could then submit their invoice to the affected civil servants. That is precisely what the commission has done in passing on to civil servants the cost of regulating conditions of employment through the mechanism of collective bargaining.

The dissent further assigns significance to the fact that the commission authorizes, rather than requires, an employer to force its employees to pay agency shop fees. This does not affect our reasoning. The dissent cites no authority for the proposition that the

commission can authorize an employer to do something that the commission itself cannot do.[9]  Given the fact that collective bargaining can only exist as a means to permit the commission to discharge its constitutional obligation, it is irrelevant that an employer retains the choice whether to require agency shop fees.  When no agency shop fee is assessed, there is no constitutional problem.  But whenever an employer opts to require the agency shop fee, the fee comes into existence as a mechanism to fund collective bargaining and, by extension, the commission's regulatory obligations.  Permitting agency shop fees is therefore impermissible for the reasons stated earlier.

It therefore remains unnecessary for us to respond to the dissent's argument that 2012 PA 349 is prohibited by Const 1963, art 4, § 48.[10]

### CONCLUSION

The authority of the Civil Service Commission is not without limits.  Although public collective bargaining is a method by which the commission may choose to exercise its constitutional duties, it may not require collection of agency shop fees to fund its administrative operations in pursuit of those duties.  The commission's rules must

---

[9] The dissent warns of "other conditions of employment" being "subject to invalidation by this Court as improper 'appropriations[.]' " *Post* at 13.  However, the instant holding is founded solely on the agency shop fee's unique relationship to the entire collective bargaining framework.  "Other conditions of employment" are not before this Court.

[10] See note 4 of this opinion.

14

yield to the Constitution when there is no authority for it to impose such fees. Accordingly, we affirm, albeit on different grounds, the judgment of the Court of Appeals.

Robert P. Young, Jr.
Stephen J. Markman
Brian K. Zahra
David F. Viviano

STATE OF MICHIGAN

SUPREME COURT

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE, AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA et al.,

        Plaintiffs-Appellants,

v                                   No. 147700

NINO E. GREEN et al.,

        Defendants-Appellees.

_____

KELLY, J. (*dissenting*).

I respectfully dissent from the majority's conclusion that the Civil Service Commission's "agency fee" rule, Civil Service Rule 6-7.2, exceeds the bounds of its constitutional authority. Instead, I would hold that Rule 6-7.2 is consistent with the commission's authority to "regulate all conditions of employment in the classified [civil] service" and to determine "the qualifications of all candidates for positions in the classified service."[1] Moreover, I would hold that the Legislature cannot abrogate Rule 6-7.2 by enacting 2012 PA 349 because the people of this state have specifically limited the Legislature's authority to "enact laws providing for the resolution of disputes concerning

_____

[1] Const 1963, art 11, § 5; see also *Dudkin v Civil Serv Comm*, 127 Mich App 397, 408-409; 339 NW2d 190 (1983).

public employees" to public employees who are not in the classified civil service.[2]  I would therefore reverse the Court of Appeals and hold that 2012 PA 349 does not apply to employees in the classified civil service.

## I.  THE CIVIL SERVICE COMMISSION'S CONSTITUTIONAL AUTHORITY

Article 11, § 5 of the Michigan Constitution establishes the Civil Service Commission as an executive agency and enumerates the following powers unique to the commission:

> The commission shall classify all positions in the classified service according to their respective duties and responsibilities, fix rates of compensation for all classes of positions, approve or disapprove disbursements for all personal services, determine by competitive examination and performance exclusively on the basis of merit, efficiency and fitness the qualifications of all candidates for positions in the classified service, make rules and regulations covering all personnel transactions, and regulate all conditions of employment in the classified service.[3]

This provision originated in substantially the same form by a vote of the people in 1940,[4] four years after a report by then Governor Frank Fitzgerald's study commission condemned "the system of political appointments, promotions, demotions, rewards and punishments" that existed in Michigan as part of the spoils system.[5]

---

[2] Const 1963, art 4, § 48.

[3] Const 1963, art 11, § 5.

[4] The provision, as initially enacted, did not refer to "competitive examination and performance," only "competitive performance."  Const 1908, art 6, § 22.  The current language was added during the 1961-1962 Constitutional Convention and ratified by the people as part of the 1963 Constitution.

[5] *Council No 11, AFSCME v Civil Serv Comm*, 408 Mich 385, 397; 292 NW2d 442 (1980).

2

In the 75 years since the people of Michigan created the commission, this Court has consistently held that "[t]he power to make 'rules and regulations covering all personnel transactions, and regulate all conditions of employment in the classified service' is indeed a plenary grant of power."[6] This power includes the "authority to regulate employment-related activity involving internal matters such as job specifications, compensation, grievance procedures, discipline, collective bargaining and job performance, including the power to prohibit activity during working hours which is found to interfere with satisfactory job performance" and "to regulate and even prohibit off-duty activity which is found to interfere with job performance."[7]

Given that promulgating rules authorizing collective bargaining is within the scope of the commission's authority—a claim that the majority does not contest—the Court of Appeals has long held that the commission determines whether employees in the classified civil service may engage in collective bargaining at all:

> The constitution of 1963 does not expressly give public employees the right to collectively bargain. . . . The commission controls all conditions of employment and is vested with plenary powers in its sphere of authority. . . . Only the Civil Service Commission has the power to provide

---

[6] *Id*. at 406. This grant of power is mandatory: the commission "*shall . . .* regulate all conditions of employment in the classified service." Const 1963, art 11, § 5 (emphasis added). See *State Hwy Comm v Vanderkloot*, 392 Mich 159, 180; 220 NW2d 416 (1974) (opinion by WILLIAMS, J.) ("[T]he popular and common understanding of the word 'shall' is that it denotes mandatoriness.").

[7] *Council No 11*, 408 Mich at 406-407.

for grievance procedures because it alone has the power to "regulate *all* conditions of employment" in the state classified civil service.[8]

In regulating the conditions of employment, the commission has determined as a matter of policy to allow collective bargaining when the employees transfer bargaining authority to their exclusive representative.[9]  "Employees may organize, form, assist, join, or refrain from joining labor organizations,"[10] and a majority of votes within a particular employee unit establishes "a labor organization as the exclusive representative of all eligible

---

[8] *Welfare Employees Union v Civil Serv Comm*, 28 Mich App 343, 352; 184 NW2d 247 (1970) (citations omitted), quoting Const 1963, art 11, § 5.  The Court of Appeals has further held that the commission "is not required to extend to state classified employees collective bargaining benefits," *id*. at 354, and this is consistent with the majority opinion's conclusion that the commission may permit collective bargaining, even while the commission maintains substantial discretion to reject or alter collective bargaining agreements.  See Civ Serv R 6-10.2 ("The civil service commission may reject or modify, in whole or in part, any provision of a proposed collective bargaining agreement, including a provision previously approved by the commission."); Civ Serv R 6-3.4 ("A primary or secondary collective bargaining agreement approved by the civil service commission remains in effect between the parties during its approved term, unless otherwise amended by the commission during its term as provided in rules 6-3.5 or 6-3.8(c).").

[9] While the commission's decision to allow collective bargaining is a discretionary policy decision that can be rescinded, see *Welfare Employees Union*, 28 Mich App at 352, its current policy is consistent with labor policies articulated in 1935 by the federal Wagner Act, which describes collective bargaining as "protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."  29 USC 151.  Collective bargaining further "encourag[es] practices fundamental to the friendly adjustment of . . . disputes arising out of differences as to wages, hours, or other working conditions, and [restores] equality of bargaining power between employers and employees."  *Id*.

[10] Civ Serv R 6-5.1.

employees in [the] unit . . . ."[11]  The exclusive representative is the sole representative that may bargain with the employer.[12]

As part of its decision to establish collective bargaining, the commission enacted Rule 6-7.2, which allows an employer and an exclusive collective bargaining representative to agree—either as part of a collective bargaining agreement or by separate agreement—to "require, as a condition of continued employment, that each eligible employee in the unit who chooses not to become a member of the exclusive representative shall pay a service fee to the exclusive representative."[13]  Accordingly, under agreements authorized by Rule 6.7-2, while an employee has the option to join or refrain from joining labor organizations,[14] an employee does not have the option both to refrain from joining the labor organization that is his or her exclusive representative and

---

[11] Civ Serv R 6-6.3.

[12] Civ Serv R 6-5.3(a) ("With respect to proper subjects of bargaining, exclusively represented employees may be represented only through their exclusive representative.").

[13] Rule 6-7.2 does not *require* agency fees; it merely *authorizes* them.  Whether a collective bargaining agreement or other agreement requires employees to pay agency fees is, ultimately, a matter negotiated between the employer and the exclusive representative.  If the parties' agreement to charge an agency fee appears in a collective bargaining agreement that is then ratified by a vote of the employees, the fee may be paid as an automatic deduction from the employee's paycheck.  However, the employer "shall not deduct a service fee unless the employee has filed a prior written authorization or as otherwise authorized in a collective bargaining agreement."  Civ Serv R 6-7.2.

[14] Civ Serv R 6-5.1 ("Employees may organize, form, assist, join, or refrain from joining labor organizations.").

5

to refuse to pay the service fee. Otherwise, the employee would receive the benefit of the exclusive representative's mandated services without paying for those services.[15]

As a result, the service fee (or "agency fee") contemplated in Rule 6-7.2 is designed to pay the exclusive representative for its responsibilities to represent all employees—both members and nonmembers—not only during the collective bargaining process but also while the collective bargaining agreement is in effect. Agency fees cannot, however, encompass any activities outside of that process. To this end, Rule 6-7.3 specifies that the fee "cannot exceed the employee's proportionate share of the costs of the activities that are necessary to perform its duties as the exclusive representative in dealing with the employer on labor-management issues" and "may include only the costs germane to collective bargaining, contract administration, grievance adjustment, and any other cost necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues."[16] To ensure that agency fees encompass only the designated activities, Rule 6-7.4 details the right of an employee to object to the amount of a fee and the concurrent obligation of the exclusive representative to provide "financial information sufficient to determine how the service fee is calculated."[17]

---

[15] See *Eastern Mich Univ Chapter of Amer Ass'n of Univ Professors v Morgan*, 100 Mich App 219, 227; 298 NW2d 886 (1980) (describing an agency fee as both "an effort to promote effectiveness of the bargaining unit and to discourage 'free riders' ").

[16] Civ Serv R 6-7.3.

[17] Civ Serv R 6-7.4(a). See also Civ Serv R 6-7.6 ("An exclusive representative shall account for and report fees and expenses in such detail as necessary to allow employees

6

While the enactment of 2012 PA 349 illustrates that the policy rationales behind mandatory agency fees are debatable, what is clear to both sides of the policy debate is that agency fees are paid directly to an employee's exclusive representative, not to the commission, the employer, or any other public entity. By likening the commission's rule authorizing agency fees to the legislative "power to tax and appropriate" and by claiming that the commission's agency fee rule attempts to exercise "the power to compel funding for its administrative operational duties from another. . . source,"[18] the majority disregards this essential purpose of agency fees. Contrary to the majority's claim, agency fees do not amount to a tax or appropriation because, quite simply, they do not fund the commission's "administrative operational duties" to establish the conditions of employment.[19] Rather, employees pay agency fees directly to their exclusive representative for the costs associated with representation during the collective bargaining process and while a collective bargaining agreement is operable. While the commission has separate operational and regulatory duties that include approving, rejecting, or amending the collective bargaining agreement that arises out of the

---

to determine the proportionate costs of expenditures necessarily or reasonably incurred for the purposes of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues.").

[18] *Ante* at 7, 11.

[19] *Ante* at 11.

collective bargaining process,[20] there has been no finding—not even an allegation—that agency fees fund these regulatory efforts.[21]

As stated, this Court has specifically held that the commission's authority includes the authority "to regulate employment-related activity involving internal matters such as job specifications, compensation, grievance procedures, discipline, *collective bargaining* and job performance[.]"[22]  The agency fee rule is a permissible exercise of the

---

[20] Civ Serv R 6-3.1(b) ("The civil service commission retains the authority to (1) approve, modify, or reject, in whole or in part, a proposed collective bargaining agreement presented to it for review and (2) to impose on the parties and eligible employees a collective bargaining agreement as modified by the commission."); Civ Serv R 6-3.1(c) ("[T]he commission retains the authority, during the term of a collective bargaining agreement, to modify the agreement without the approval of the parties . . . .").

[21] Furthermore, as noted earlier, whether a collective bargaining agreement or other agreement requires employees to pay agency fees is, ultimately, a matter negotiated between the employer and the exclusive representative.

[22] *Council No 11*, 408 Mich at 406 (emphasis added).  Moreover, I would conclude that Rule 6-7.2 also falls within the commission's authority to "determine by competitive examination and performance exclusively on the basis of merit, efficiency and fitness the qualifications of all candidates for positions in the classified service[.]"  Const 1963, art 11, § 5.  Rule 6-7.2 bears on the efficiency of civil service operations: by enacting a rule that conditions continued employment either on membership in a union or on payment of an agency fee, the commission has determined that negotiating with a single exclusive representative, rather than employees individually, enhances the efficiency of the classified civil service. *Dudkin*, 127 Mich App at 408-409.  Importantly, this Court has interpreted the term "candidates for positions" to include those already employed in civil service positions, and therefore the criterion of efficiency applies to existing employees, such as those covered by Rule 6-7.2. *Reed v Civil Serv Comm*, 301 Mich 137, 159; 3 NW2d 41 (1942).

8

commission's regulatory authority because the rule regulates the mechanics of an employment-related activity—the collective bargaining process.[23]

The majority's conclusion upsets this traditional understanding of the scope of the commission's constitutional authority to regulate the conditions of employment for employees in the classified state civil service. We do not misunderstand the majority's argument: the majority itself observes that a ratified collective bargaining agreement does not establish the conditions of employment for classified state employees. That collective bargaining agreement is only the starting point for the commission's purposes, because it must accept, reject, or modify the agreement during its own internal review process. Only when approved by *the commission*—using the Legislature's appropriation—does a collective bargaining agreement actually establish the conditions of employment.[24] The majority's analysis conflates the collective bargaining *negotiation* process, which is external to the commission, with the commission's own process for *approving* a collective bargaining agreement. In reviewing, and then accepting, rejecting, or modifying the collective bargaining agreement, the commission must still "regulate particularized 'conditions of employment for the eligible employees in the applicable unit.'"[25]

---

[23] In the same way, Civ Serv R 6-9.2 regulates the collective bargaining process by requiring the state personnel director to "establish a time frame for the conduct of primary negotiations and impasse resolution."

[24] See Civ Serv R 6-2.1(d).

[25] *Ante* at 12 n 6, quoting Civ Serv R 6-2.1(d).

9

Indeed, in alleging that the commission "foist[s] the administrative costs" of establishing the conditions of employment onto employees, the majority ignores the fact that the employees *themselves* have chosen, for better or worse, to organize and select an exclusive representative.[26] Similarly, the employees themselves can change a bargaining unit's exclusive representative—or dispense with the collective bargaining process entirely, if they believe that the costs of agency fees do not warrant further representation.[27] If the employees choose the latter approach, the commission's rules establish that any existing collective bargaining agreement is "immediately void and the unit members are subject to the rates of compensation and other conditions of employment applicable to other nonexclusively represented employees."[28] Once that occurs, the employer "shall not deduct dues or service fees from any classified employee . . . except dues and service fees deducted through the pay period in which the decertification is issued."[29]

---

[26] *Ante* at 13. For this reason, the majority's comparison to "a panel of consultant labor economists," *ante* at 13, is inapt.

[27] See Civ Serv R 6-6.2.

[28] Civ Serv R 6-6.3(e)(2). Indeed, if collective bargaining did not exist at all, the commission would simply apply these default rates of compensation and conditions to all classified employees. The collective bargaining process proposes an *alternative* to those default rates of compensation and conditions of employment, and the commission must review that alternative proposal and accept, reject, or revise using the funds appropriated to it from article 11, § 5. This review would occur *regardless* of whether agency fees existed and shows that, while the commission has established a policy to allow collective bargaining, it does not benefit either from the collective bargaining process or from the agency fees that employees pay their exclusive representative.

[29] Civ Serv R 6-6.3(e)(3).

10

That the nature of the commission's authority to promulgate Rule 6-7.2 is policy-driven and not a quasi-tax or quasi-appropriation is further supported in the legislative history of the Right to Work law itself. From 1973 until 2012, the Legislature explicitly permitted employers of *nonclassified* public employees to require similar agency fees.[30] Moreover, while 2012 PA 349 purported to ban the imposition of agency fees on most public employees,[31] it exempted this prohibition with regard to "public police or fire department employee[s]" and "state police trooper[s] or sergeant[s]."[32] The Legislature's policy decision to do so was an exercise of its authority to "enact laws providing for the resolution of disputes concerning public employees" outside of the classified civil

---

[30] Former MCL 423.210(1)(c) was enacted as 1973 PA 25 and stated

> [t]hat nothing in this act or in any law of this state shall preclude a public employer from making an agreement with an exclusive bargaining representative . . . to require as a condition of employment that all employees in the bargaining unit pay to the exclusive bargaining representative a service fee equivalent to the amount of dues uniformly required of members of the exclusive bargaining representative[.]

This provision was upheld by the United States Supreme Court against a First Amendment challenge in *Abood v Detroit Bd of Ed*, 431 US 209; 97 S Ct 1782; 52 L Ed 261 (1977). The pending decision in *Friedrichs v California*, ___ US ___; ___ S Ct ___; L Ed 2d ___ (Docket No. 14-915), cert gtd June 30, 2015, may affect *Abood*'s continued viability, although *Abood*'s holding that the First Amendment does not preclude public employee agency fees remained in effect at the time this case was decided.

[31] MCL 423.210(3).

[32] MCL 423.210(4)(a).

11

service[33] or to "enact laws relative to the . . . conditions of employment,"[34] not its authority to tax or appropriate.[35]

Indeed, the majority's analysis fails on its own terms. Even assuming (as we do not) the majority's premise that agency fees are "foisted on" employees, the commission has the explicit authority to "fix rates of compensation for all classes of positions," subject only to a legislative override for compensation increases.[36] As a result, the commission has the absolute authority to *reduce* employees' compensation, and the majority likewise ignores the effect that mandatory agency fees have on reducing a bargaining unit's compensation.

The majority's decision is an untested application of state constitutional law that may well yield unintended consequences. If the commission's rule—merely authorizing,

---

[33] Const 1963, art 4, § 48.

[34] Const 1963, art 4, § 49.

[35] Const 1963, art 9, § 1 (taxation); Const 1963, art 4, § 31 (general appropriation bills). Public Act 349 of 2012 is, and the former MCL 423.210(1)(c) was, a part of the public employment relations act (PERA). It was only with the enactment of 2012 PA 53 that the phrase "to make appropriations" was added as one of the purposes of PERA. Title, 1947 PA 336, amended 2012 PA 53. Notably, though, 2012 PA 53 contained an *explicit* appropriation of $100,000 to implement a requirement that, by March 1 of every year, "each exclusive bargaining representative that represents public employees in this state shall file with the commission an independent audit of all expenditures attributed to the costs of collective bargaining, contract administration, and grievance adjustment during the prior calendar year." Similarly, 2012 PA 349, to prohibit agency fees in most circumstances, the Legislature explicitly appropriated $1 million to the department of licensing and regulatory affairs. See MCL 423.210(7).

[36] Const 1963, art 11, § 5.

12

and not *requiring*, agency fees to appear in collective bargaining agreements—is an unconstitutional appropriation, then what other conditions of employment are subject to invalidation by this Court as improper "appropriations"? Because I prefer a more straightforward application of our Constitution, I dissent from the majority's conclusion and instead would hold that Rule 6-7.2 is a constitutional exercise of the commission's authority to regulate the conditions of employment and to determine the qualifications of employees in the classified civil service.

## II. LIMITS OF LEGISLATIVE AUTHORITY

By invalidating Rule 6-7.2 as beyond the scope of the commission's constitutional authority, the majority avoids the issue that divided the Court of Appeals and that was actually presented to this Court: whether the Legislature has the authority to invalidate the policy created by Rule 6-7.2 by enacting a conflicting statute—namely, 2012 PA 349. For the following reasons, I would hold that article 4, § 48 precludes 2012 PA 349 from applying to employees in the state classified civil service and that, instead, Rule 6-7.2 continues to apply to employees in the state classified civil service.[37]

Article 4, § 48 provides the Legislature with the discretionary authority to "enact laws providing for the resolution of disputes concerning public employees, except those in the state classified civil service." This exception to the legislative power is crucial because it demonstrates that the drafters and ratifiers understood the commission as

---

[37] That the majority does not examine this issue at all further emphasizes the fact that they resolved this case on the basis of issues that were outside the issues that were actually briefed and argued.

13

having the *exclusive* role in resolving disputes concerning employees in the classified service. Moreover, the Constitutional Convention's Address to the People specifically indicates that "[t]he state classified civil service is exempted" from article 4, § 48 "because the constitution has specific provisions in this area," namely, article 11, § 5.[38]

As explained earlier, an agency fee is adopted as part of the collective bargaining process and involves an employee's payment to the exclusive representative in lieu of membership dues. The collective bargaining process, culminating in a collective bargaining agreement, delineates and memorializes how the employer and employee will resolve disputes or grievances, including the role that the exclusive representative has in resolving those disputes or grievances.[39] In other words, agency fees are intended not just to pay for the collective bargaining process that determines employees' rights, but also to pay for the services rendered by the exclusive representative on behalf of a classified employee in matters such as "the resolution of disputes concerning public employees" that arise under the collective bargaining agreement.[40] As a result, the Legislature's attempt to abolish the agency fee rule runs afoul of article 4, § 48 to the extent that it seeks to regulate employment relations for a class of individuals who have been expressly exempted from such regulation.

---

[38] 2 Official Record, Constitutional Convention 1961, p 3377.

[39] See Civ Serv R 6-5.3(b) ("With respect to grievances brought under the provisions of the collective bargaining agreement, an employee may be represented only by the exclusive representative.").

[40] Const 1963, art 4, § 48.

The fact that agency fees are directly paid to the employees' exclusive representative is crucial to this conclusion because it directly ties those fees to the specific exclusion of legislative authority in article 4, § 48. If Rule 6-7.2 were to require a payment to an organization that is unaffiliated with the collective bargaining or employee grievance process—whether a charitable organization, a civic organization, or a political organization—then article 4, § 48 would not prohibit the Legislature's attempt to ban those payments. But, when the commission's agency fee rule defines the relationship between an employee and his or her exclusive representative, an attempt by the Legislature to override such a rule is limited by the exclusion of state classified employees from the Legislature's article 4, § 48 powers.

## III. CONCLUSION

For the reasons stated, I respectfully dissent from the majority's decision to affirm the judgment of the Court of Appeals on alternative grounds. Instead, I would uphold the authority of the commission to promulgate the agency fee rule, reverse the judgment of the Court of Appeals, and hold that article 4, § 48 precludes 2012 PA 349 from applying to employees in the state classified civil service.

Mary Beth Kelly
Bridget M. McCormack
Richard H. Bernstein

15