*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

T & V ASSOCIATES, INC d/b/a RIVER CREST CATERING,

        Plaintiff-Appellant,

v

DIRECTOR OF HEALTH AND HUMAN SERVICES,

        Defendant-Appellee.

FOR PUBLICATION
June 29, 2023
9:05 a.m.

No. 361727
Court of Claims No.
21-000075-MM

Before: BOONSTRA, P.J., and GADOLA and YATES, JJ.

GADOLA, J.

Plaintiff, T & V Associates, Inc, appeals as of right the order of the Court of Claims granting defendant, Department of Health and Human Services Director Elizabeth Hertel, summary disposition of plaintiff's claim under MCR 2.116(C)(8). We reverse.

## I. FACTS AND BACKGROUND

The facts of this case are essentially undisputed. Plaintiff is a corporation that operated a catering service and banquet facility in Oakland County for many years. Its events typically included more than 25 patrons and often more than 100 patrons, and the events usually extended beyond 11:00 p.m.

Beginning in March 2020, Governor Gretchen Whitmer issued a series of executive orders declaring a "state of emergency" and a "state of disaster" in Michigan in response to the outbreak of the acute respiratory disease known as COVID-19. The executive orders were issued by the Governor pursuant to the Emergency Management Act of 1976 (the EMA), MCL 30.401 *et seq.*, and the Emergency Powers of the Governor Act of 1945 (the EPGA), MCL 10.31 *et seq.*[1] *In re Certified Questions From United States Dist Court*, 506 Mich 332, 337-338; 958 NW2d 1 (2020).

---

[1] Repealed by 77 PA 2021.

The executive orders regulated many of the daily activities of Michigan residents and affected their ability to operate their businesses.

By opinion dated October 2, 2020, our Supreme Court determined that the Governor did not possess authority under the EMA to declare a "state of emergency" or "state of disaster" based on the COVID-19 pandemic after April 30, 2020, and that the Governor does not possess the authority to exercise emergency powers under the EPGA "because that act is an unlawful delegation of legislative power to the executive branch in violation of the Michigan Constitution." *In re Certified Questions*, 506 Mich at 337-338. The executive branch, however, through defendant the Director of the Department of Health and Human Services, acting under MCL 333.2253, continued issuing comparable orders unabated, similarly regulating many of the daily activities of Michigan residents, including their ability to operate their businesses.[2]

On March 19, 2021,[3] defendant issued an order entitled "Emergency Order under MCL 333.2253 – Gatherings and Face Mask Order" (the Order). The Order was effective from March 22, 2021 through April 19, 2021, and stated that the Order was issued because "the COVID-19 pandemic continues to constitute an epidemic in Michigan" and "that control of the epidemic is necessary to protect the public health and that it is necessary to restrict gatherings and establish procedures to be followed during the epidemic to ensure the continuation of essential public health services and enforcement of health laws." The Order also provided, in relevant part:

> (b) Gatherings are prohibited at food service establishments, whether indoor or outdoor, unless:
>
> * * *
>
> (4) At establishments offering indoor dining:

[2] See *In re Certified Questions*, 506 Mich at 405-406 (VIVIANO, J., concurring in part and dissenting in part) ("the Director of the Department of Health and Human Services (DHHS) has issued a series of orders under MCL 333.2253 simply 'reinforcing' key executive orders on COVID-19, such as those mandating masks and instituting the Safe Start Program, which itself contains the Governor's overarching regulatory response to COVID-19. . . . In other words, nearly everything the Governor has done under the EPGA, she has also purported to do, via the DHHS Director, under MCL 333.2253.") The day the Supreme Court issued *In re Certified Questions*, Governor Whitmer issued a press release stating that the decision was "deeply disappointing," that she "vehemently disagree[d]" with the Court's interpretation of Michigan's Constitution, and that "many of the responsive measures I have put in place to control the spread of the virus will continue under alternative sources of authority that were not at issue in today's ruling." https://www.michigan.gov/coronavirus/news/2020/10/02/statement-from-governor-whitmer-on-michigan-supreme-court-ruling-on-emergency-powers (posted October 2, 2020) (accessed May 24, 2023).

[3] Department of Health and Human Services Director Robert Gordon issued a similar order on November 15, 2020.

(A) The number of patrons indoors (or in a designated dining area of a multipurpose venue) does not exceed 50% of normal seating capacity, or 100 persons, whichever is less, provided, however, that this limitation does not apply to soup kitchens and shelters;

(B) At food service establishments, or the designated dining area of a multipurpose venue, indoor dining is closed between the hours of 11:00 PM and 4:00 AM.

On April 13, 2021, plaintiff filed its complaint in the Court of Claims seeking declaratory judgment, alleging that MCL 333.2253 is an unconstitutional delegation of legislative authority and alleging that defendant exceeded her authority under that statute. The complaint further alleged violation of plaintiff's right to procedural and substantive due process. Defendant moved for summary disposition under MCR 2.116(C)(5) and (8), contending that plaintiff's claim was barred by mootness and lack of standing, and that plaintiff had failed to state a claim. The Court of Claims granted defendant's motion for summary disposition under MCR 2.116(C)(8). The Court of Claims held that plaintiff's claim was not moot and that plaintiff did not lack standing, but that plaintiff had failed to state a claim upon which relief could be granted because MCL 333.2253 is not an unconstitutional delegation of legislative authority. The Court of Claims also held that plaintiff had failed to demonstrate a violation of due process. Plaintiff now appeals.

## II. DISCUSSION

### A. MOOTNESS

Plaintiff contends that the Court of Claims erred by granting defendant summary disposition because the legislature's grant of authority to defendant under MCL 333.2253 is an unconstitutional delegation of legislative power to the executive branch. Defendant contends that plaintiff's challenge is moot because defendant's Order is no longer in effect, and plaintiff no longer operates its catering and banquet business.

Mootness is a threshold inquiry that must be addressed before a court reaches the substantive issues of a case. *Can IV Packard Square, LLC v Packard Square, LLC*, 328 Mich App 656, 661; 939 NW2d 454 (2019). We review de novo whether an issue is moot. *Flynn v Ottawa Co Dep't of Public Health*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 359774); slip op at 3. This Court decides actual cases and controversies; a case that does not rest upon existing facts or rights and instead presents only abstract questions of law is moot. *Gleason v Kincaid*, 323 Mich App 308, 314-315; 917 NW2d 685 (2018). An issue also is moot if an event has occurred that makes it impossible for the reviewing court to grant relief. *Can IV Packard Square*, 328 Mich App at 666. This Court generally dismisses a case that is moot without addressing the underlying merits. *Gleason*, 323 Mich App at 315.

In this case, an actual case and controversy exists based upon existing facts and rights; the dispute is not abstract. Defendant's Order directly restricted plaintiff's ability to operate its business. Plaintiff's amended complaint alleges that defendant's action in issuing the Order exceeded her authority under MCL 333.2253, and further that MCL 333.2253 is an unconstitutional delegation of legislative authority. Defendant disputes that the Order was unlawful or unconstitutional. Moreover, the dispute is not concluded; plaintiff continues to be a

banquet and catering corporation and MCL 333.2253 continues to authorize defendant to issue emergency orders. A case is not necessarily rendered moot by a party ceasing the activity that is challenged as illegal. *Anglers of Au Sable, Inc v Dep't of Environmental Quality*, 486 Mich 982, 983 (2010) (CAVANAGH, J., concurring), citing *United States v W T Grant Co*, 345 US 629, 633; 73 S Ct 894; 97 L Ed 1303 (1953). There is thus a present legal controversy, not merely a hypothetical or abstract legal question. See *Gleason*, 323 Mich App at 314-315.

We also observe that the mootness doctrine is not inflexible. *Turunen v Dir of Dep't of Natural Resources*, 336 Mich App 468, 480; 971 NW2d 20 (2021). This Court will address an issue regardless of mootness if the issue is one "of public significance and [is] likely to recur, yet may evade judicial review." *In re Midland Publishing Co, Inc*, 420 Mich 148, 152 n 2; 362 NW2d 580 (1984). "An otherwise moot issue may thus appropriately be addressed by a court when there is a reasonable expectation that the publicly significant alleged wrong will recur yet escape judicial review, in which case the issue, though moot, is nonetheless justiciable." *Gleason*, 323 Mich App at 315. Regarding this issue, the Court of Claims aptly reasoned:

> Defendant's exercise of the powers afforded by MCL 333.2253 is, at some point, likely enough to recur so as to warrant review of the questions presented in this case. The statutory authority to issue orders under MCL 333.2253 has been invoked numerous times already in response to COVID-19, . . . It is not a stretch to conclude that the issuance of additional public-health orders could potentially occur – and like these orders, be revoked sometime thereafter – making the issues raised in this case not only capable of repetition but also potentially capable of evading review. In addition, the Supreme Court's decision in *In re Certified Questions from United States District Court*, 506 Mich 332; 958 NW2d 1 (2020), which invalidated a source of statutory authority relied on by the Governor to issue similar orders, makes it more likely that issues surrounding MCL 333.2253 are likely to arise again.

We conclude that the issue before us is not moot. In addition, defendant's exercise of authority under MCL 333.5523 is an issue of public significance that is likely to recur, yet may evade judicial review. The Court of Claims therefore did not err by determining that mootness was not a bar to the justiciability of plaintiff's claim.

RESPONSE TO THE DISSENT REGARDING MOOTNESS

As the dissent correctly observes, "[f]or far too long, in courts all across this country, the COVID-19 wars have raged on." The genesis of this state of affairs is, to quote another venerable jurist, that "[s]ince 2020, we may have experienced the greatest intrusions on civil liberties in the peacetime history of this country . . . [which] forced individuals to fight for their freedoms in court on emergency timetables." *Arizona v Secretary of Homeland Security*, 598 US ___, ___ (2023) (Statement by GORSUCH, J.); slip op at 4-7. The dissent urges that the intrusion on civil liberties is behind us, obviating an uncomfortable examination of the deeds of yesteryear, and suggests that we decline to "dive into the turbulent waters of COVID litigation by resolving T & V's constitutional claims on the merits" and instead handily declare the case to be moot. That legal disputes may take considerable time to resolve, and that the passions that ignited them may have cooled in the meantime, is not in any sense a legal principle that would support a finding of

-4-

mootness. The vindication of constitutional rights is sometimes a time-consuming exercise, but a necessary one to the health of a democracy.

We forgo the invitation to declare this matter moot because the record does not support that determination. However bothersome for this Court, an actual case and controversy exists in this matter, based upon existing facts and rights; it has not been rendered moot by the cessation of the director's actions. See *Anglers of Au Sable, Inc*, 486 Mich at 983 (CAVANAGH, J., concurring). Nor has it been rendered moot by the Legislature's amendment of MCL 333.2253 by 2022 PA 274, effective March 29, 2023, adding subsections (4)-(6), and making minor revisions to subsection (1). Those revisions do not affect our analysis and did not curb the director's near limitless discretion under the statute. Under MCL 333.2253, both before and after its amendment by 2022 PA 274, the director of the DHHS may act in the exact same manner challenged in this case. In fact, the statutory amendments on which the dissent so heavily relies are likely to have an effect opposite the one the dissent suggests. By in no way limiting the director's discretion to issue orders identical to those considered here, the director may regard the legislature's (in)action as a tacit (or not so tacit) endorsement of the measures taken in this case, leaving the director free to reimpose each and every one of the challenged restrictions.

In addition, contrary to the assertion that we "cannot take up the merits of T & V's constitutional claims if the mootness doctrine applies," and that dismissal is the "legally mandated approach," we underscore that this Court has not only the ability and discretion, but indeed the duty, to address a moot issue when the issue is one of public significance and is likely to recur, yet evade judicial review. If this matter were moot, it nonetheless would be properly justiciable by this Court under the mootness doctrine as an issue of public significance likely to recur but evade judicial review. See *Gleason*, 323 Mich App at 315. We do not "brush[] aside mootness concerns" as the dissent suggests, nor do we shrink from reaching the merits of this case; diving into turbulent waters is the task assigned to us; that is what the taxpayers of Michigan pay us to do—resolve legal disputes in a court of law so that the litigants do not choose other less savory methods of resolving their differences.

B. STANDING

Defendant also contends that plaintiff lacks standing to seek declaratory relief. Defendant argues that no actual controversy exits between the parties because the COVID-19 restrictions in question no longer exist, and plaintiff no longer operates its catering and banquet business. Because standing is an issue of justiciability, it may be raised at any time as an issue related to jurisdiction. See *Equity Funding, Inc v Village of Milford*, ___ Mich App at ___, ___; ___ NW2d ___ (2022) (Docket No. 357062); slip op at 2. We review the issue of standing de novo. *Michigan Ass'n of Home Builders v City of Troy*, 504 Mich 204, 212; 934 NW2d 713 (2019).

In its amended complaint, plaintiff sought declaratory judgment under MCR 2.605. "[W]henever a litigant meets the requirements of MCR 2.605, it is sufficient to establish standing to seek a declaratory judgment." *League of Women Voters of Michigan v Secretary of State*, 506 Mich 561, 585-586; 957 NW2d 731 (2020) (quotation marks and citation omitted). MCR 2.605 "incorporates the doctrines of standing, ripeness, and mootness," *Int'l Union, United Auto, Aerospace & Agricultural Implement Workers of America v Central Mich Univ Trustees*, 295 Mich App 486, 495; 815 NW2d 132 (2012), providing, in relevant part:

-5-

(A) Power to Enter Declaratory Judgment.

(1) In a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted.

Thus, to assert a claim for declaratory judgment under MCR 2.605, the plaintiff (1) must allege a "case of actual controversy" within the jurisdiction of the court, and (2) the claimant must be an "interested party seeking a declaratory judgment." "An actual controversy exists when a declaratory judgment is needed to guide a party's future conduct in order to preserve that party's legal rights." *League of Women Voters*, 506 Mich at 586. The "essential requirement" for finding that an actual controversy exists is that the plaintiff "plead and prove facts which indicate an adverse interest necessitating the sharpening of the issues raised." *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 372 n 20; 792 NW2d 686 (2010) (quotation marks and citations omitted). A court "is not precluded from reaching issues before actual injuries or losses have occurred," but there still must be "a present legal controversy, not one that is merely hypothetical or anticipated in the future." *League of Women Voters*, 506 Mich at 586. Stated another way:

> "[J]udicial power, as we have seen, is the right to determine actual controversies arising between adverse litigants . . . . The right to declare a law unconstitutional arises because an act of congress relied upon by one or the other of such parties in determining their rights is in conflict with the fundamental law. *In re Jarzynka*, ___ Mich ___, ___; 979 NW2d 855 (2023) (VIVIANO, J., concurring), quoting *Washington-Detroit Theater Co v Moore*, 249 Mich 673, 677; 229 NW 618 (1930).]

In this case, an actual controversy exists. Defendant issued an emergency order on March 19, 2021, under MCL 333.2253, that directly restricted plaintiff's ability to operate its business. Plaintiff's amended complaint alleges that defendant's action in issuing the Order exceeded her authority under MCL 333.2253 and that MCL 333.2253 is an unconstitutional delegation of legislative authority. Defendant disputes that the Order was unlawful or unconstitutional. The dispute is neither hypothetical nor merely anticipated. Nor is the dispute concluded; the plaintiff corporation continues to exist and defendant continues to be authorized by MCL 333.2253 to issue emergency orders.

In addition to alleging an actual controversy, a plaintiff seeking declaratory judgment must be an interested party. MCR 2.605(A)(1). In the context of standing, a party's interest is sufficient if the party has "a legally protected interest that is in jeopardy of being adversely affected," *Barclae v Zarb*, 300 Mich App 455, 483; 834 NW2d 100 (2013) (quotation marks and citation omitted), and a "special injury or right, or substantial interest that will be detrimentally affected in a manner different from the citizenry at large." *Lansing Sch Ed Ass'n*, 487 Mich at 372. In this case, the Court of Claims determined that plaintiff is an interested party because plaintiff alleges that it is a food service entity subjected to the regulations imposed by defendant under MCL 333.2253. Although plaintiff has closed its banquet facility, plaintiff asserts that the corporation has not been dissolved and continues to exist as a banquet and catering corporation. The Court of Claims found that though plaintiff has ceased operations, it nonetheless has an interest in obtaining declaratory relief regarding the constitutionality of the statute, particularly because defendant's actions under

the statute are the cause of plaintiff ceasing its business. We agree that plaintiff has alleged a protected interest, that of operating its business, which is jeopardized by defendant's authority under MCL 333.2253 to affect that protected interest. Plaintiff therefore is an interested party.

Defendant challenges the Court of Claims' determination, asserting that plaintiff lacks standing to seek declaratory judgment. The term "standing" generally refers to the right of a plaintiff initially to invoke the power of the trial court to adjudicate a claimed injury. *Federated Ins Co v Oakland Co Road Comm*, 475 Mich 286, 290; 715 NW2d 846 (2006). Generally, a party has standing if the party has a real interest in the cause of action or the subject matter of the cause of action. *Lake v Putnam*, 316 Mich App 247, 250; 894 NW2d 62 (2016). "The purpose of the standing doctrine is to assess whether a litigant's interest in the issue is sufficient to ensure sincere and vigorous advocacy." *Lansing Sch Ed Ass'n*, 487 Mich at 355 (quotation marks and citation omitted). "[W]hen standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request adjudication of a particular issue and not whether the issue itself is justiciable." *Allstate Ins Co v Hayes*, 442 Mich 56, 68; 499 NW2d 743 (1993) (quotation marks and citation omitted).

Defendant argues that even if plaintiff had standing in the past, it is no longer operating its food service business and that any assertion that the situation could recur is merely a request for an advisory opinion and that plaintiff's interest now is no different than that of the general public. Unlike the mootness doctrine, which makes an exception for significant public issues that otherwise might evade judicial review, standing requires that the actual controversy be a "live" controversy. Defendant's argument appears to be more one of mootness than standing; defendant argues that there no longer exists an actual controversy, not that no controversy between the parties ever existed. Under defendant's argument, all claims under these circumstances would be invalid either because they occurred in the past or because they anticipate future damage.[4] A declaratory judgment, however, by its nature anticipates a scenario in which a defendant's actions have caused an actual controversy between the parties and a plaintiff seeks a ruling from the Court to guide the parties' conduct in the future. Here, plaintiff still exists as a banquet and catering corporation and therefore is affected by defendant's power to act under MCL 333.2253. Plaintiff therefore adequately alleged standing to seek declaratory judgment to guide the parties' future conduct and to preserve plaintiff's legal rights. See *League of Women Voters*, 506 Mich at 586. The Court of Claims correctly concluded that plaintiff, although not currently conducting its catering and banquet business, continues to be an interested party. Because plaintiff met the criteria of MCR 2.605, plaintiff did not lack standing.

## C. UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER

Plaintiff contends that the Court of Claims erred by granting defendant summary disposition because the legislature's grant of authority to defendant pursuant to MCL 333.2253 is so broad and without any cognizable standard for the exercise of that authority that it constitutes an unconstitutional delegation of legislative power. We agree.

---

[4] Such a rule would be particularly objectionable when, as here, defendant's actions allegedly are the cause of plaintiff discontinuing its food service operation.

To have the force and effect of law, defendant's March 19, 2021 Order must arise from the legislature's lawful authorization of the use of executive power. The Order was issued pursuant to MCL 333.2253. If MCL 333.2253 is not a lawful authorization of power by the legislature to the executive branch of government, then no amount of "emergency" justifications, whether based in science or public policy, are sufficient to withstand a constitutional challenge.

## 1. STANDARD OF REVIEW

This Court reviews de novo the constitutionality of a statute. *In re Certified Questions*, 506 Mich at 340. "Statutes are presumed to be constitutional and [courts] have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *People v Skinner*, 502 Mich 89, 100; 917 NW2d 292 (2018) (quotation marks and citation omitted). We construe a statute as unconstitutional only when that is the one predominant and reasonable construction of the statute. *In re Certified Questions*, 506 Mich at 355-356. We therefore begin with the presumption that a statute is constitutional and proceed with caution in determining a challenge to the constitutionality of a statute. See *League of Women Voters v Secretary of State*, 339 Mich App 257, 273; 981 NW2d 538 (2021).

We also review de novo the trial court's decision to grant or deny summary disposition. *Meemic Ins Co v Fortson*, 506 Mich 287, 296; 954 NW2d 115 (2020). A motion for summary disposition under MCR 2.116(C)(8) tests the legal sufficiency of the complaint; this Court accepts all well-pleaded factual allegations of the complaint as true. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). A motion for summary disposition under MCR 2.116(C)(8) is properly granted when, based upon the pleadings alone, the claims alleged are unenforceable as a matter of law and no factual development could justify recovery. *Id*.

This Court also reviews de novo questions of law relating to a declaratory judgment action, and reviews for an abuse of discretion the trial court's decision to grant or deny declaratory judgment. *Equity Funding, Inc*, ___ Mich App at ___; slip op at 2. A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes, *Berryman v Mackey*, 327 Mich App 711, 717; 935 NW2d 94 (2019), or when it makes an error of law. *Ronnisch Constr Group, Inc v Lofts on the Nine, LLC*, 499 Mich 544, 552; 886 NW2d 113 (2016).

## 2. SEPARATION OF POWERS

The Michigan Constitution of 1963 sets forth the principle of separation of powers as follows:

> The powers of the government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution. [Const 1963, art 3, § 2.]

The principal function of the separation of powers is the protection of individual liberty. *In re Certified Questions*, 506 Mich at 357. "When the legislative and executive powers are united in the same person, . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner." Baron

-8-

de Montesquieu, *The Spirit of Laws*. London: J. Norse and P. Vaillant, 1758), Book XI, ch 6, p 216.

The Michigan Constitution provides that "the legislative power of the State of Michigan is vested in a senate and a house of representatives." Const 1963, art 4, § 1. Our Supreme Court has observed that the legislative power has been defined as the power "to regulate public concerns, and to make law for the benefit and welfare of the state." *46th Circuit Trial Court v Crawford Co*, 476 Mich 131, 141; 719 NW2d 553 (2006), quoting Cooley, Constitutional Limitations (1886), p 92. "[T]he power conferred upon the legislature to make laws cannot be delegated by that department to any other body or authority." *In re Certified Questions*, 506 Mich at 358, quoting Cooley, Constitutional Limitations (1886), pp 116-117. "Strictly speaking, there is *no* acceptable delegation of legislative power." *In re Certified Questions*, 506 Mich at 358, quoting *Mistretta v United States*, 488 US 361, 419; 109 S Ct 647; 102 L Ed 2d 714 (1989) (SCALIA, J., dissenting). Rather,

> [t]he power of the *legislative* being derived from the people by a positive voluntary grant and institution, can be no other, than what the positive grant conveyed, which being only to make *laws*, and not to make *legislators*, the *legislative* can have no power to transfer their authority of making laws, and place it in other hands. [*Id.*, quoting J. Locke, Second Treatise of Government 87, (R. Cox ed. 1982) (emphasis in *Mistretta*).]

Because the legislature cannot delegate its legislative power, the question is whether the legislature's authorization of the use of executive or judicial power in a particular statute is so general that it amounts to a delegation of legislative power. *In re Certified Questions*, 506 Mich at 358-359. If the legislature authorizes the executive or judiciary to exercise power, the legislature must provide "an intelligible principle to guide the delegee's use of discretion" to overcome the prohibition against delegation. *Id.* at 360. Whether an authorization of power by the legislature to the executive or judiciary is unconstitutional therefore depends upon the scope of the power delegated and the specificity of the standards governing the exercise of the power delegated. *Id.* When determining whether a statute is an impermissible delegation of legislative authority, the court must "constru[e] the challenged statute to figure out what task it delegates and what instructions it provides." *Id.* If the scope of the authority granted is great, the standards must be "correspondingly more precise." *Id.* at 360-361. "In other words, it is one thing if a statute confers a great degree of discretion, i.e., power, over a narrow subject; it is quite another if that power can be brought to bear on something as 'immense' as an entire economy." *Id.* at 361-362. In addition, "[t]he area of permissible indefiniteness narrows . . . when the regulation invokes criminal sanctions and potentially affects fundamental rights . . ." *Id.* at 362.

The duration of the delegated power also is relevant, although an unconstitutional delegation of legislative authority is still unconstitutional even if the duration of the delegated power is short. *Id.* Nonetheless, a grant of indefinite authority is a greater grant of power than a grant of temporary authority. *Id.* When the scope of powers granted is broad in both subject matter and duration, the standards imposed upon the delegee's discretion must become correspondingly more detailed and precise. *Id.* at 363.

### 3. MCL 333.2253

Following the issuance of the Supreme Court's opinion in *In re Certified Questions* on October 2, 2020, then Department of Health and Human Services Director Robert Gordon issued an emergency order designated the "Emergency Order under MCL 333.2253 - Gatherings and Face Mask Order." That order restricted nearly all public gatherings, including at stores and businesses, required face masks, required businesses to refuse entry to those without face masks, and required contact tracing for patrons of businesses. The orders effectively shut down in-person dining in restaurants, ultimately driving numerous food service establishments out of business.

Defendant gradually lifted these restrictions in January and February 2021. On March 19, 2021, however, defendant issued "Emergency Order under MCL 333.2253 – Gatherings and Face Mask Order." This 12-page order again imposed restrictions on nearly every aspect of the lives of Michigan residents by limiting the capacity of all gatherings both indoors and outdoors, restricting public gatherings, and requiring face masks. The reach of the Order again was near total and severely curtailed all business within the state, and again effectively shut down a large portion of the restaurant business. A review of the Order reacquaints the reader with the breadth and all-pervasiveness of the restrictions imposed. The Order, by executive fiat, also provided criminal punishment for violators of up to six months' imprisonment, and civil penalties of $1,000 per violation or per day that a violation continued.

Though not identical, the terms of defendant's Order were similar in scope and in effect to the terms of the Governor's executive orders issued related to COVID-19 under the EPGA. With regard to the Governor's executive orders, our Supreme Court determined that

> Each of these policies was putatively ordered "to protect life and property" and/or to "bring the emergency situation within the affected area under control." What is more, these policies exhibit a sweeping scope, both with regard to the subjects covered and the power exercised over those subjects. Indeed, they rest on an assertion of power to reorder social life and to limit, if not altogether displace, the livelihoods of residents across the state and throughout wide-ranging industries. *In re Certified Questions*, 506 Mich at 365.

The Order issued by defendant, who it bears noting is an unelected appointee of the Governor responsible for running a state agency, similarly reordered social life and limited and displaced the livelihoods of residents and included punishment measures severe enough to compel compliance. The Order was an exercise of overwhelmingly broad power, substantial in scope and effect, and affecting virtually every aspect of the daily lives and the livelihoods of the people of Michigan. Defendant issued the Order pursuant to MCL 333.2253 on March 19, 2021. At that time,[5] MCL 333.2253(1) provided:

---

[5] MCL 333.2253 was amended by 2022 PA 274, effective March 29, 2023, adding subsections (4)-(6), and making minor revisions to subsection (1) that do not affect our analysis.

(1) If the director determines that control of an epidemic is necessary to protect the public health, the director by emergency order may prohibit the gathering of people for any purpose and may establish procedures to be followed during the epidemic to insure continuation of essential public health services and enforcement of health laws. Emergency procedures shall not be limited to this code.

Thus, under MCL 333.2253(1), both before and after its amendment by 2022 PA 274, the director of the DHHS may act under that section if the director determines that control of an epidemic is "necessary" to protect the public health. If the director makes that determination, the director is authorized by the statute to issue emergency orders (1) prohibiting the gathering of people for any purpose and (2) establishing procedures to be followed during the epidemic to ensure continuation of essential public health services and enforcement of health laws. The statute contains no temporal restriction on the use of this power.

The statute does not define the term "epidemic." This Court generally gives undefined terms their plain and ordinary meaning, and may consult a dictionary to ascertain the meaning of a term within the context of the statute. *Honigman Miller Schwartz and Cohn LLP v City of Detroit*, 505 Mich 284, 305-306; 952 NW2d 358 (2020). When used as a noun, the term "epidemic" is defined as "an outbreak of a disease that spreads quickly and affects many individuals at the same time," but also is defined as "an outbreak or product of sudden rapid spread, growth, or development," such as "an epidemic of bankruptcies." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.meriam-webster.com/dictionary/epidemic (accessed May 18, 2023).

Interestingly, in the field of public health, use of the term "epidemic" is not restricted to contagion, nor even to disease. For example, the Centers for Disease Control (CDC) has declared that obesity is a national epidemic,[6] as is opioid overdose.[7] According to the World Health Organization, a tobacco epidemic poses "one of the biggest public health threats the world has ever faced."[8] Meanwhile, the Agency for Healthcare Research and Quality states on an official website of the U.S. Department of Health and Human Services that illiteracy is "the silent

---

[6]CDC Newsroom, *Obesity Epidemic Increases dramatically in the United States* https://www.cdc.gov/media/pressrel (posted October 26, 1999)(accessed May 17, 2023).

[7]Centers for Disease Control and Prevention, *Understanding the Opioid Overdose Epidemic*, https://www.cdc.gov/opioids/basics/epidemic.html (accessed May 17, 2023).

[8]World Health Organization Fact Sheets, *Tobacco*, https://www.who.int/news-room/fact-sheets/detail/tobacco (posted May 24, 2022) (accessed May 17, 2023).

epidemic."[9]  And according to the U.S. Surgeon General, the most widespread epidemic, and the one that poses the greatest threat to public health, is loneliness.[10]

The statute also does not define the term "necessary."  Our Supreme Court considered the use of the word "necessary" as a standard in the EPGA in *In re Certified Questions*.  The Court reasoned:

> Concerning the term "necessary," that word means "absolutely needed: REQUIRED."  *Merriam-Webster's Collegiate Dictionary* (11th ed).  Given the exceptionally broad scope of the EPGA, which authorizes indefinite orders that are "necessary to protect life and property," we believe that such a standard is also insufficient to satisfy the nondelegation doctrine when considered both in isolation and alongside the word "reasonable."  [*In re Certified Question*s, 506 Mich at 368.]

The Court determined that the standard "necessary" did not "supply any meaningful limitation upon the exercise of the delegated power."  *Id*. at 369.   The Court explained that the EPGA, in setting forth a "necessary" standard, just as in setting forth a "reasonable" standard, neither supplied genuine guidance to the Governor as to how to exercise the authority delegated to her by the EPGA nor constrained her actions in any meaningful manner.  *Id*.  Here, too, the standard that the director need only determine that control of an epidemic is "necessary" is likewise a "non-standard" that does not supply any genuine guidance to the Director as to how the authority permitted under MCL 333.2253 is to be exercised, nor does it constrain the actions of the Director in any meaningful manner.

In addition to leaving the term "epidemic" undefined and providing no meaningful limitation upon the exercise of the delegated power with the term "necessary," MCL 333.2253 does not require that an epidemic actually exist in Michigan before the director is empowered to act under the statute.  Rather, MCL 333.2253 requires only that the director determine that "control of an epidemic is necessary to protect the public health."  The language of the statute suggests that if an epidemic exists anywhere, MCL 333.2253 authorizes the director to act by emergency order if the director determines that control of the epidemic is necessary to protect the public health.  Arguably, under the language of the statute the director could determine that to protect the public health it is necessary to "control" an epidemic that exists by taking measures to prevent an epidemic from entering the state.  For example, if a contagious disease were spreading through Indiana, the director arguably could determine that "control of an epidemic is necessary to protect the public health," and exercise the powers conferred by MCL 333.2253 to issue orders preventing Michigan residents from traveling to Indiana or reentering Michigan from Indiana.  Similarly, if

---

[9] Marcus, EN, Agency for Healthcare Research and Quality, PSNET, *The Silent Epidemic – the Health Effects of Illiteracy* https://psnet.ahrq.gov/issue/silent-epidemic-health-effects-illiteracy (posted August 9, 2006) (accessed May 17, 2023).

[10]US Dep't of Health and Human Services, *New Surgeon General Advisory Raises Alarm about the Devastating Impact of the Epidemic of Loneliness and Isolation in the United States* https://www.hhs.gov/sites/default/files/surgeon-general-social-connection-advisory.pdf   (posted May 3, 2023)(accessed May 17, 2023).

-12-

obesity or loneliness were rampant in Indiana (or anywhere else), arguably the director likewise could determine that "control of an epidemic is necessary to protect the public health," and exercise the powers conferred by MCL 333.2253 to issue orders imposing restrictions on Michigan residents. Relatedly, could the director order Michigan residents to socialize with one another to combat the epidemic of loneliness, or to exercise vigorously to combat the obesity epidemic, arguing that these measures are necessary to ensure continuation of essential public health services? The irony of this no longer far-fetched hypothetical is apparent given the COVID-19 orders that required just the opposite (restricting people from gathering and from using communal exercise facilities).

In fact, MCL 333.2253 provides little guidance to the delegee regarding what actions an emergency order under that section may dictate. Defendant is authorized by that section to issue emergency orders (1) prohibiting the gathering of people for any purpose and (2) establishing procedures to be followed during the epidemic to ensure continuation of essential public health services and enforcement of health laws. In our fictional example of a contagious disease spreading through Indiana, could the director determine that it is necessary to "control" that epidemic by ordering the building of a wall along the Michigan/Indiana state line as a procedure to ensure "continuation of essential public health services and enforcement of health laws?" Or could such a wall be erected to prevent the influx of opioids to stem the epidemic of drug abuse already declared to exist by certain public health authorities? There is nothing in the statute to suggest that the director could not undertake such a measure.

Nor does the statute require the measures ordered by the director to be rationally related to controlling the epidemic. That is, the statute does not state that the director is authorized to take measures to control the epidemic. Rather, the director need only determine that control of the epidemic is necessary; once that determination is made, the director "may prohibit the gathering of people for any purpose" and "establish procedures to be followed during the epidemic to insure continuation of essential public health services and enforcement of health laws," regardless of whether those measures are rationally related to controlling the epidemic.

Our Supreme Court determined that the EPGA, MCL 10.31 *et seq*., which restricted the power delegated to the executive only with the words "necessary" and "reasonable," did not provide sufficient standards to curtail the power granted and that those terms were essentially "non-standards." See *In re Certified Questions*, 506 Mich at 367-372. Less guidance appears in MCL 333.2253 as a limitation on the director's authority than appears in the EPGA as a limitation on the Governor's authority; MCL 333.2253 requires only that the Director determine that control of the epidemic is necessary, without even a requirement that the action taken be reasonable. Logically, if "necessary" and "reasonable" together are inadequate legislative guidance, then "necessary" without the requirement of reasonableness is less adequate still. MCL 333.2253 authorizes the director to "prohibit the gathering of people for any purpose" and to "establish procedures to be followed during the epidemic to insure continuation of essential public health services and enforcement of health laws," presumably until control of the epidemic is no longer necessary in the estimation of the director. Again, the statute does not require that the measures ordered be designed to end or even to control the epidemic, but only "to insure continuation of essential public health services and enforcement of health laws." The result is that the statute surrenders legislative power to the executive branch "without specification or definition of means

-13-

or ends all the powers which it could grant by specific enactment . . ." *In re Certified Questions*, 506 Mich at 371 (quotation marks and citation omitted).

We find that the power delegated by the legislature to the executive in MCL 333.2253 is extremely broad and is essentially unlimited by restrictive standards. As discussed, when the scope of the authority granted by the legislature is great, the standards placed by the legislature upon the discretion of the delegee must be correspondingly more precise. *In re Certified Questions*, 506 Mich at 360-361. Further, "[t]he area of permissible indefiniteness narrows . . . when the regulation invokes criminal sanctions and potentially affects fundamental rights . . ." *Id.* Although MCL 333.2253 does not specifically authorize the director to impose criminal sanctions, the statute does not preclude such measures and the Order in question contained criminal sanctions for violators of the Order. In addition, the statute contains no temporal restriction, only that the director must determine that control of an epidemic is necessary. The indefinite duration of the director's powers under MCL 333.2253 is comparable to the indefinite duration of the Governor's powers under the EPGA, MCL 10.31 *et seq.*, which our Supreme Court determined to be so broad as to support the conclusion that the EPGA was an unconstitutional delegation of legislative power. See *In re Certified Questions*, 506 Mich at 337-338.[11] We conclude in this case that MCL 333.2253 similarly is an unconstitutional delegation of legislative power to the executive branch, calling to mind the many sound reasons our system of government, at both the state and federal levels, is built upon a foundation of collective law-making in a system divided among three branches of government designed to protect against government overreach and the invasion of rights guaranteed under our fundamental laws.[12] The Court of Claims erred by granting defendant summary disposition of plaintiff's claim.

---

[11] While the EPGA considered in *In re Certified Questions* is not the same statute we consider here, it would seem incongruous to conclude that the director of a state department, who is a member of the Governor's cabinet and reportable to the Governor, could do by executive decree that which the Governor herself is prohibited from doing as a result of our Supreme Court's holding in *In re Certified Questions*. To uphold the director's authority in this case would be to say that the subordinate officer may do that which her principal the Governor is forbidden from doing. This would be anomalous, to say the least, and not permissible given the utter lack of standards and limiting principles appearing in MCL 333.2253.

[12] "Since March 2020, we may have experienced the greatest intrusions on civil liberties in the peacetime history of this country. Executive officials across the country issued emergency decrees on a breathtaking scale. Governors and local leaders imposed lockdown orders forcing people to remain in their homes. They shuttered businesses and schools, public and private. They closed churches even as they allowed casinos and other favored businesses to carry on. They threatened violators not just with civil penalties but with criminal sanctions too. . . . They divided cities and neighborhoods into color-coded zones, forced individuals to fight for their freedoms in court on emergency timetables, and then changed their color-coded schemes when defeat in court seemed imminent."

-14-

## D. CONCLUSION

Political liberty is to be found only . . . when there is no abuse of power. But constant experience shows us that every man invested with power is apt to abuse it, and to carry his authority as far as it will go. [Baron de Montesquieu, *The Spirit of Laws*. London: J. Norse and P. Vaillant, 1758), Book XI, ch 4.]

The Court of Claims correctly determined that this matter is not moot and plaintiff does not lack standing. The Court of Claims erred, however, by determining that MCL 333.2253 is not

---

* * *

"While executive officials issued new emergency decrees at a furious pace, state legislatures and Congress – the bodies normally responsible for adopting our laws – too often fell silent. Courts bound to protect our liberties addressed a few - but hardly all – of the intrusions upon them. . . .

Doubtless, many lessons can be learned from this chapter in our history, and hopefully serious efforts will be made to study it. One lesson might be this: Fear and the desire for safety are powerful forces. They can lead to a clamor for action – almost any action – as long as someone does something to address a perceived threat. A leader or an expert who claims he can fix everything, if only we do exactly as he says, can prove an irresistible force. We do not need to confront a bayonet, we need only a nudge, before we willingly abandon the nicety of requiring laws to be adopted by our legislative representatives and accept rule by decree. Along the way, we will accede to the loss of many cherished civil liberties – the right to worship freely, to debate public policy without censorship, to gather with friends and family, or simply to leave our homes. We may even cheer on those who ask us to disregard our normal lawmaking processes and forfeit our personal freedoms. Of course, this is no new story. Even the ancients warned that democracies can degenerate toward autocracy in the face of fear.

But maybe we have learned another lesson too. The concentration of power in the hands of so few may be efficient and sometimes popular. But it does not tend toward sound government. However wise one person or his advisors may be, that is no substitute for the wisdom of the whole of the American people that can be tapped in the legislative process. Decisions produced by those who indulge no criticism are rarely as good as those produced after robust and uncensored debate. Decisions announced on the fly are rarely as wise as those that come after careful deliberation. Decisions made by the few often yield unintended consequences that may be avoided when more are consulted. Autocracies have always suffered these defects. Maybe, hopefully, we have relearned these lessons too." [*Arizona v Secretary of Homeland Security*, 598 US ___, ___ (2023) (Statement by GORSUCH, J.); slip op at 4-7.]

an unconstitutionally broad delegation of legislative authority, and therefore erred by determining that plaintiff was not entitled to declaratory judgment.[13]

Reversed.

/s/ Michael F. Gadola
/s/ Mark T. Boonstra

---

[13] Because we hold that MCL 333.2253 is an unconstitutional delegation of legislative authority, we decline to reach plaintiff's claims that defendant violated plaintiff's right to substantive and procedural due process.